## THE AVALON.

(District Court, N. D. West Virginia. April 21, 1909.)

1. SHIPPING (§ 33*)—MORTGAGES—RECORDING.

   A re-registry of a vessel at a different port does not necessitate the re-recording in the collector's office at that port of a mortgage duly recorded when made at the former port.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 113; Dec. Dig. § 33.*]

2. MARITIME LIENS (§ 14*)—UNDER MARITIME LAW—ADVANCES.

   Banks lending money to a "steamer and owners," without knowing, or making any effort to know, for what purpose it was expended, are not

entitled to maritime liens on the general testimony of the master that the money was used in the operation of the boat.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 18; Dec. Dig. § 14.*]

**3.** COURTS (§ 372*) — FEDERAL COURTS — STATE LAWS AS RULES OF DECISION — COMMERCIAL LAW—ATTORNEY'S FEES.

A provision in a negotiable note for the payment of attorney's fees by the maker in case of collection by suit, when such note is collected in a court of admiralty in another state by the enforcement of a mortgage on a vessel securing the same, is not governed by the law of the state where the contract was made, but by the general commercial law, and will not be enforced by a federal court, and especially where, owing to the death of the maker, insolvent, the amount, if allowed, must be taken from holders of junior liens.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 977–979; Dec. Dig. § 372.*]

**4.** SHIPPING (§ 32*)—MORTGAGES—PRIORITY OF LIEN.

A mortgage executed by part owners of a vessel on their interest and duly recorded in the office of the collector where the vessel is registered, on distribution of the proceeds of the vessel when sold in admiralty to pay liens, is entitled to priority from the mortgagors' share of the proceeds over debts of the owners which were not liens.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 105; Dec. Dig. § 32.*]

## In Admiralty.

On January 12, 1907, R. Wild filed his libel against the steamer Avalon for debt. Numerous intervening libels were filed for like purpose, all of which were referred to Commissioner L. V. G. Morris to ascertain, among other things, "the nature, amount, character, and priority of all maritime liens, or liens, under the provisions of section 14 of chapter 75 of the Code of West Virginia, against the steamer Avalon." Also, "what liens by mortgage, deed of trust, or otherwise, exist that are not maritime liens, or liens under the said statute of West Virginia, and whether such liens exist against the whole vessel, or individual interests therein, giving the nature, amount, and priority of all such liens." This same decree appointed a receiver for the steamer, and under subsequent ones sale was made of it and confirmed, and the proceeds have been paid into the registry of this court. Commissioner Morris has filed three reports in the cause. To the last one, filed June 9, 1908, exceptions have been filed, which present the matters in controversy now to be determined.

The commissioner has reported numerous liens in seven distinct orders of priority. Those reported as first, second, third, and fourth have been in no way controverted, and, by orders entered herein, have been paid by the registrar. The steamer sold for $9,800. The costs and four first classes of liens so paid amounted to $7,227.98, leaving $2,572.02 yet to be disbursed. The commissioner has reported as fifth in order of priority, now first payable out of the remaining balance of the fund (less any additional costs unpaid), a balance of a debt of $1,049.11 to the First National Bank of Chattanooga, Tenn. The origin of this debt was as follows: On May 9, 1903, L. Cramer was the sole owner of the steamer, but owed $11,000 of the purchase money, due to the Chattanooga & Tennessee River Packet Company for its half interest purchased by him from it. On that day he executed three notes for this purchase money to the packet company, and, to secure the same, a mortgage upon the steamer, which was duly filed and recorded in the collector's office of the port of Chattanooga. These three notes so executed and secured, upon their face provided that, "if this note is collected by an attorney by suit or otherwise," all fees and costs of collection were to be paid by the maker. They were indorsed to this First National Bank; two of them were paid, and there now remains only a balance of $1,049.11 on the third and last one. It is insisted,

---

however, that to this sum should be added an allowance of $300 as a fee to the proctor of said bank. This allowance was denied by the commissioner. Sixth in priority out of the undistributed balance is reported eight different debts as follows: To Citizens' National Bank of Parkersburg $220.53; to the First National Bank of Cincinnati $548.08; to the Parkersburg Banking & Trust Company $109.10; to the Citizens' National Bank of Parkersburg $540.33; to the Citizens' National Bank of Parkersburg $435.46; to the Union Trust & Deposit Company of Parkersburg $488.33; to the First National Bank of Parkersburg $216.70; and to the Citizens' National Bank of Parkersburg $113.73. All of the foregoing debts in this class, except the last one, are represented by notes executed by the "Steamer Avalon and Owners," by its managing owner and master. The last one represents an overdraft in the steamer's regular checking account. The master, as seventh in order of payment, has reported as debts due to part owners to R. Wild $1,115.90, to J. L. Cramer $525.08 and $7.83, and to H. E. Cramer $471.47. Finally, he has reported certain claims as existing against the steamer which, because not shown to have been for the proper management and operation of the steamer, he determines are not maritime liens, and only payable after all the other liens in the preceding classes had been paid. Among the debts so reported in this last class is one for $4,440 to the Citizens' National Bank of Parkersburg, evidenced by two notes executed, one by L. Cramer, the other by L. Cramer and Jesse L. Cramer, and secured by a mortgage executed by these part owners on their twenty-six thirty-second interests in the steamer on April 9, 1906, duly recorded in the collector's office at the port of Wheeling. Exceptions are taken to said report on behalf of this claim, because it is not reported first in priority as against the balance of the fund undistributed, or at least as against twenty-six thirty-seconds thereof. Exceptions are taken by banks reported in the sixth class (second class as to the undistributed balance) to the allowance of the mortgage debt to the First National Bank of Chattanooga as prior to their claims. The banks in this class claim priority in this particular on the grounds that their debts were advances made to pay operating expenses of the boat. There is no dispute as to the validity and amounts due upon the several debts reported. The sole controversy is as to the proper order of priority in payment thereof.

Dorr Casto, for First Nat. Bank of Chattanooga, Tenn.

W. S. Blizzard, for First Nat. Bank of Cincinnati, Ohio.

V. B. Archer, for Citizens' Nat. Bank of Parkersburg, W. Va.

DAYTON, District Judge (after stating the facts as above). Did the commissioner err in reporting the debt due the First National Bank of Chattanooga as entitled to prior payment? I think not, for these reasons: This debt was incurred for the purchase by Cramer of the half interest held by the Chattanooga & Tennessee River Packet Company whereby he became sole owner of the steamer, and it was secured by a mortgage duly recorded in the collector's office in Chattanooga. At the time, the Avalon was registered at the port of Chattanooga, and it was its home port, the residence of the packet company, and it was plying on the Tennessee river. This was therefore the proper port in whose collector's office such mortgage had legally to be recorded. Two years afterwards, Cramer caused her to be registered at the port of Wheeling, W. Va., in the same New Orleans district, and entered her upon the Ohio river trade. Cramer's home residence was at Parkersburg, W. Va. It is insisted that, because the bank's mortgage was not recorded in the collector's office in Wheeling after re-registry of the boat had been made there, the lien of it was lost. I do not think so. The laws of the United States, as I understand them, make no such specific requirement, while they do require,

in case the registry of a boat is changed from one port to another, that the second registry record shall distinctly set forth the port of former registry. This should be sufficient, it seems to me, to put upon inquiry any one seeking security by mortgage to ascertain whether such prior mortgage had been recorded in the first port of entry, at least where both ports are in the same district. It is to be remembered that these mortgages are not maritime liens, and that they are not, and cannot be, governed by the rules prevailing as to real estate and fixed properties under state laws where state and county divisions are well defined, but have been regulated by federal statute in force since 1850 (Act Cong. July 29, 1850, 9 Stat. 440). This ruling seems to me to be clearly upheld in White's Bank v. Smith, 7 Wall. 646, 19 L. Ed. 211, where it is said:

"And in this connection we may also mention that in case of the sale of a vessel, which can only be to a citizen or citizens of the United States, and a new and permanent registry becomes necessary, the former certificate of registry must be delivered to the collector to whom application is made for the new registry, to be transmitted by him to the Register of the Treasury to be canceled; and in every such sale or transfer of a vessel there shall be some instrument in writing in the nature of a bill of sale, which shall recite at length the certificate of the former registry, otherwise the ship or vessel shall be incapable of being registered anew. 1 Stat. 294, § 14. And, as this bill of sale is recorded in the collector's office in which the new permanent registry is made, it affords information to any person examining it as to the former home port and collector's office in which the vessel had been previously registered, and where examination can be made for any bill of sale, mortgage, or other incumbrance upon or against the vessel.

"It will be seen, therefore, as the law now stands, that there can be very little difficulty on the part of a purchaser or mortgagee in ascertaining the true condition of the title of a vessel, as it respects written evidence of the same, or of incumbrances thereon, from an examination of the records of the collector's office at the several home ports of the vessel, as the records of the last home port refer to the preceding one, the last bill of sale incorporating into it a copy of the previous certificate of registry. In this respect, the system of recording in the collector's office possesses very great advantages over the filing of these instruments in the clerk's offices where the vendor or mortgagor happened to reside at the time, as no means exist, under this practice, by which the subsequent purchaser or mortgagee, by any diligence, could obtain knowledge of the actual condition of the title.

"We are aware that in the case of Potter v. Irish, 10 Gray (Mass.) 416, the court came to the conclusion, upon an examination of the acts on this subject, that bills of sale, mortgages, etc., under the act of 1850, in order to protect the title of the purchaser or mortgagee, should be recorded in the office of the collector of customs at the port of the last registry or enrollment, though not the home port of the vessel. And the court in the case of Chadwick v. Baker, 54 Me. 9, followed this decision. Our respect for the courts rendering these decisions has led us to examine the several statutes upon which this question depends with more than usual care, and, after the best consideration we have been able to give, we are obliged to differ with them. We think the better construction of these statutes leads to the conclusion that the home port was the one in the contemplation of Congress at which these instruments were to be recorded, and is the more appropriate one in furtherance of the object for which the act was passed."

See, also, Aldrich v. Ins. Co., 8 Wall. 491, 19 L. Ed. 473; Baldwin v. The Bradish Johnson, Fed. Cas. No. 798; The Carrie Brooks, Fed. Cas. No. 11,718; The Vigilancia, 73 Fed. 452, 19 C. C. A. 528; The Gordon Campbell (D. C.) 131 Fed. 963.

But this disposes of but one of the objections made to the allowance of priority given by the commissioner to this mortgage debt, and we must next consider the one especially urged by the banks having the eight claims reported next in priority to it. They claim precedence to it because they urge their claims to be true maritime liens for advances made for the operation of the vessel and expended for that purpose. The settlement of this question depends upon the facts involved. It is well settled that:

"One who lends money on request of the proper authority for the purpose of paying off maritime liens upon a vessel, and who looks to the vessel as his security, has a lien upon the vessel for such advances equal in dignity to the liens which he satisfies. But such advances not made on authority of one having the right to bind the ship does not give a lien. Nor does the lien arise on a mere personal loan of money or credit to the vessel owner, although such money or credit may be used by him for the ship's purposes.

"As the right of a lender of money to claim a lien is derivative through the lien holder, it follows that, in order to entitle himself to such a right, he must satisfy himself that the liens proposed to be paid are themselves valid and enforceable and that his funds are applied to that purpose."

26 Cyc. 764, 765, and authorities cited.

In this case the claims of these banks are sought to be established as maritime liens substantially alone upon the testimony of the ship's master that the sums loaned were used in the operation of the boat. There is no attempt made to show the individual parties to whom the sums were paid, the character of either the labor, material, or supplies furnished by them; nothing in short, to inform us as to whether the claims paid with these moneys were in themselves true maritime liens. There is no attempt to show that these banks made any effort, at the time these loans were effected, to see to the application of the money to the payment of maritime liens, as to which alone subrogation in their favor would be enforceable; but, on the contrary, it seems very clear that these loans were made in regular course of banking business to the "Steamer Avalon and Owners" without any care or attention as to how the money should be expended. Under these circumstances, these banks are not entitled to have their debts reported as maritime liens, and cannot claim precedence in payment over this mortgage debt due to the First National Bank of Chattanooga.

Finally, did the master err in not allowing to this Chattanooga bank the proctor's fee claimed by it under the terms of its note which provided that, if it was collected by an attorney by suit or otherwise, all fees and costs of collection were to be paid by the maker? It is insisted that this note was a Tennessee contract, and should be governed by the law of Tennessee, which upholds and enforces contracts of this kind. I cannot agree with this proposition. On the contrary, the note was clearly negotiable, governed solely by the commercial law, in construing which federal courts act independently of state court decisions. It is being enforced in this court, situate in West Virginia. While some of the states recognize and enforce contracts of this character, Virginia and West Virginia courts since 1833, when the question was decided in Toole v. Stephen, 4 Leigh, 581, have uniformly held such contracts to be usurious and unenforceable. I am entirely in sympathy with this ruling of these courts, and while, in

construing the commercial law of the country, I may not be bound to follow it as I have said, yet I fully concur in approving the sound principles upon which, in my judgment, it is based. This case seems to me to present a striking illustration of its justness. The proctor for this Chattanooga bank has very carefully, faithfully, and with decided ability defended the assaults made in the case against the priority of this claim, which had to be maintained if it was to be paid at all. It has required much labor, investigation, and study on his part, and no one acquainted with the circumstances and conditions can fairly deny that his services in the premises have been worth the $300 asked, yet, if it should be allowed, the bank, on its balance of less than $1,200, would be receiving more than 25 per cent. of its debt above the 6 per cent. interest it bears by law. Every dollar of this excess, usurious in fact, would be borne by other creditors, and not by the original borrower, now dead, with an insolvent estate. Those loaning money for profit must take risks like all others in business life, and efforts of this kind to protect them from such risks too often result in oppression of the borrower on the one hand, and subsequent creditors of his on the other, to merit the approval of justice and equity. This is especially so when such contracts are unrecorded and therefore unknown to those extending subsequent credit. See this question considered in Chestertown Bank v. Walker (C. C. A.) 163 Fed. 510.

There being no error in the commissioner's report finding this Chattanooga bank to be entitled to payment of its balance of mortgage debt without proctor fees in the fifth class prior to others as to the balance of the fund undistributed, it remains to be determined whether or not he erred in refusing to report the mortgage debt of $4,440 held by the Citizens' National Bank of Parkersburg a lien next in priority upon said undistributed balance after payment of the Chattanooga bank's debt. I think he did so err in not reporting said debt next in order on twenty-six thirty-seconds ($^{26}/_{32}$) of said balance, but not as to six thirty-seconds ($^{6}/_{32}$) thereof. This debt was secured by mortgage duly recorded in 1906 in the collector's office at Wheeling, the then home port of the Avalon, it having been re-registered there permanently the year before. This mortgage was executed by a part of the owners holding twenty-six thirty-seconds of the steamer, only upon the interests so held by them. As I have heretofore fully set forth, I do not believe the bank debts given by the commissioner priority to this mortgage one can be held to be maritime liens, but they must be held to be simple unsecured claims. This mortgage debt, while not a maritime lien, is a secured claim, and is entitled to priority over these unsecured ones.

The balance of the fund in the registrar's hands should be disbursed, first, to the payment of any unpaid balance of costs, including $250 now allowed to the receiver as claimed by him in full for his services as such; second, to the First National Bank of Chattanooga, Tenn., the balance in full of its debt, less registrar's commission; third, twenty-six thirty-seconds of the balance remaining, less registrar's commission, to the Citizens' National Bank of Parkersburg, to be credited upon its $4,440 mortgage debt, and the six thirty-seconds

remaining of such balance, less registrar's commission, ratably to the eight bank debts set forth in the commissioner's report in the sixth class. And decree may be entered accordingly.