Boris N. Sokoloff, Respondent, *v.* The National City Bank of New York, Appellant.

(Argued November 23, 1928; decided December 31, 1928.)

*Carl A. Mead, John A. Garver* and *William Deering Howe* for appellant. The deposit was paid on the plaintiff's order. (1 Morse Banks & Banking [5th ed.], 557, § 295; *Union Bank* v. *Knapp,* 3 Pick. [20 Mass.] 96; *Leonora Nat. Bank* v. *Ragland,* 128 Ky. 548; *Kuenster* v. *Woodhouse,* 101 Wis. 216; *Blinn Lumber Co.* v. *McArthur,* 150 Cal. 610; *Keyes* v. *First Nat. Bank,* 20 Fed. Rep. [2d] 678; *Mawhinney* v. *Millbrook Woolen Mills,* 231 N. Y. 290; 2 Morse Banks & Banking [5th ed.],

§§ 451, 569; *Pratt* v. *Foote,* 9 N. Y. 463; *Oddie* v. *National City Bank of New York,* 45 N. Y. 735; *People* v. *Merch. & Mech. Bank,* 78 N. Y. 269; *Briggs* v. *Central Nat. Bank,* 89 N. Y. 182; *Metropolitan Nat. Bank* v. *Loyd,* 90 N. Y. 530; *Kirkham* v. *Bank of America,* 165 N. Y. 132; *Baldwin's Bank* v. *Smith,* 215 N. Y. 76; *Consolidated Nat. Bank* v. *First Nat. Bank,* 129 App. Div. 538; 199 N. Y. 516.) The evidence shows that the plaintiff has no cause of action arising out of the failure to pay the rubles on demand in Petrograd and failure to maintain a branch in Petrograd. (2 Morse Banks & Banking [6th ed.], §§ 446, 450, 453; *Gilliam* v. *Merchants' Nat. Bank,* 70 Ill. App. 592; *Payne* v. *Gardiner,* 29 N. Y. 146; *Bank of British N. A.* v. *Merchants' Nat. Bank,* 91 N. Y. 106; *Smiley* v. *Fry,* 100 N. Y. 262; *Cottle* v. *Marine Bank,* 166 N. Y. 53; *Zimmerman* v. *Hicks,* 7 Fed. Rep. [2d] 443; *Sickles* v. *Herold,* 149 N. Y. 332; *Thurston* v. *Wolfborough Bank,* 18 N. H. 391; *Nashville Bank* v. *Henderson,* 13 Tenn. 104; *F. & M. Bank of Memphis* v. *White,* 34 Tenn. 482; *Patten* v. *American Nat. Bank,* 15 Colo. App. 479.) *Force majeure* under pre-Soviet Russian law is a complete defense to action based on breaches in Russia of a Russian contract. (*Russian Republic* v. *Cibrario,* 235 N. Y. 255; *Wulfsohn* v. *Russian Socialist Federated Soviet Republic,* 234 N. Y. 372; *Sokoloff* v. *National City Bank,* 239 N. Y. 158; 1 Hyde on International Law, 201, § 122; Beale on Conflict of Laws, § 131; *Commonwealth* v. *Chapman,* 13 Metc. 68; *Rose* v. *Himely,* 4 Cranch, 241; *Gelston* v. *Hoyt,* 3 Wheat. 246; *Mitchell* v. *United States,* 9 Pet. 711; *Kennett* v. *Chambers,* 14 How. 38; *Ortega* v. *Lara,* 202 U. S. 339; *Russian Reinsurance Co.* v. *Stoddard,* 211 App. Div. 132; 240 N. Y. 149.) There is no claim that a breach of the contract has occurred in New York. (*Hicks* v. *Guinness,* 269 U. S. 71; *Sickles* v. *Herold,* 149 N. Y. 332; *Thurston* v. *Wolfborough Bank,* 18 N. H. 391; *F. & M. Bank of Memphis* v. *White,* 34 Tenn. 482; *Patten* v. *American Nat. Bank,* 15 Colo. App. 479.) It was

erroneous for the referee to allow interest at the legal rate from the date of the closing of the branch. (*Sickles v. Herold*, 149 N. Y. 332; *Lewine v. National City Bank*, 248 N. Y. 365; *Patten v. American Nat. Bank*, 15 Colo. App. 479.)

*Morris Hillquit* for respondent. The defense of payment has not been sustained. (*Persons v. Gardner*, 122 App. Div. 167; *Kingston Bank v. Gay*, 19 Barb. 459; *Roseboom v. Billington*, 17 Johns. 182; *Brown v. Bronson*, 93 App. Div. 312; *Linden v. Thierot*, 96 App. Div. 256; *Brennen v. Hall*, 131 N. Y. 167; *Highland Bank v. Dubois*, 5 Den. 558; *National Butchers & Drovers' Bank v. Hubbell*, 117 N. Y. 389; *Sternaman v. Metropolitan Life Ins. Co.*, 170 N. Y. 13; *Industrial & General Trust v. Tod*, 180 N. Y. 215; *Simon v. Etgen*, 213 N. Y. 589; *Wigand v. Bachman-Bechtel Brewing Co.*, 222 N. Y. 272; *Klein v. Gallin*, 141 N. Y. Supp. 831.) The amount of plaintiff's deposit in the defendant's Petrograd branch became due upon his demand for payment and the defendant's failure to make such payment. (*Allen v. Clark*, 65 Barb. 563; *Geller v. Seixas*, 4 Abb. Pr. 103; *Phœnix Ins. Co. v. Allen*, 11 Mich. 501.) Even without demand the amount of plaintiff's deposit became due and payable to him upon the suspension of the operations of the defendant's Petrograd branch. (*Clark v. Crandall*, 3 Barb. 612; *McNish v. Coon*, 13 Wend. 26; *Gallagher v. Nichols*, 60 N. Y. 638; *Robinson v. Frank*, 107 N. Y. 655; *McGowan v. McDonald*, 111 Cal. 57; *Richmond v. Irons*, 121 U. S. 27; *People v. Merchants' Trust Co.*, 187 N. Y. 293; *Pratt v. Union National Bank*, 79 N. J. L. 117; *Scott v. Armstrong*, 146 U. S. 499; *Williams v. Johnson*, 144 Pac. Rep. 768; *Watson v. Phœnix Bank*. 8 Metc. 217; *Holden v. Farmers & Traders' National Bank*, 77 N. H. 535.) The defense of *force majeure* under the Russian law cannot be sustained. The courts of this State as well as the Federal courts have refused

to give effect to any laws or decrees of the Soviet government of Russia because the same has nòt been recognized as a government *de jure* or *de facto* by our State Department. (*Schweitzer* v. *H. H. P. H. Gesellschaft*, 149 App. Div. 90; *Lucia Mining Co.* v. *Evans*, 146 App. Div. 416; *Vazakas* v. *Vazakas*, 109 N. Y. Supp. 568; *Smith* v. *Compania Litografica De La Habana*, 127 Misc. Rep. 508; *Savage* v. *O' Neil*, 44 N. Y. 298; *Russian Reinsurance Co.* v. *Stoddard*, 211 App. ·Div. 132; *Dyke* v. *Erie Railway Co.*, 45 N. Y. 113.) The defendant's liability in New York upon its breach of contract in Russia was to pay to the plaintiff damages in dollars, not in rubles. (*Petkus* v. *Lietuvos Ukio Barkas*, 204 N. Y. Supp. 726; *Hicks* v. *Guinness*, 269 U. S. 71.) The measure of the plaintiff's recovery is the value of the Russian ruble at the time payment became due. (*Gross* v. *Mendel*, 171 App. Div. 237; 225 N. Y. 633; *Hoppe* v. *Russo-Asiatic Bank,* 200 App. Div. 460; 235 N. Y. 37; *Kantor* v. *Aristo Hosiery Co., Inc.,* 222 App. Div. 502; 248 N. Y. 128; *Hicks* v. *Guinness,* 269 U. S. 71; *Deutsche Bank* v. *Humphrey,* 272 U. S. 517; *Martyne* v. *American Union Fire Insurance Co.,* 216 N. Y. 183; *Zimmerman* v. *Sutherland,* 174 U. S. 253.) The plaintiff is entitled to interest from the date of the breach, at the rate of six per cent per annum. (*McGowan* v. *McDonald,* 111 Cal. 57; 43 Pac. Rep. 418; *Richmond* v. *Irons,* 121 U. S. 27; *People* v. *Merchants' Trust Co.,* 187 N. Y. 293; *Forschirm* v. *Mechanics & Traders' Bank,* 137 App. Div. 149; *Metcalf* v. *Mayer,* 213 App. Div. 607.)

CRANE, J. This case was here before on the pleadings (239 N. Y. 158). It is here now on the facts after a trial before a referee. The objections to the recovery by the plaintiff are payment and the lack of a proper demand.

Boris N. Sokoloff, a Russian subject, was in the United States from 1914 to 1917, when he returned to Russia. On June 27, 1917, he gave to the National City Bank of New York, at its main office in New York city, $30,225

and $883.50 with which to open an account for him in its Russian branch in Petrograd. The receipt given by the bank explains the transaction.

"NEW YORK, *June* 27, 1917.

"Received from Boris N. Sokoloff thirty thousand two hundred twenty-five dollars, representing the cost of Rs. 130,000 at 23¼ cents, which are to be transferred to our Petrograd Branch to open his account.

"THE NATIONAL CITY BANK OF NEW YORK

"$30,225.

"p. p. C. V. SHEEHAN."

This agreement was carried out to the extent that the account was opened by the defendant at its Petrograd Branch which held on deposit to the credit of Boris N. Sokoloff 133,800 rubles. A pass book for this amount was given to Sokoloff by the branch when he appeared in Petrograd in September of 1917. Thereafter, in the ordinary course of business, on different occasions, he withdrew 13,800 rubles from the account. Toward the end of October and the first part of November, 1917, Sokoloff, who was then in the city of Kharkoff, Russia, sent a letter to the Petrograd Branch of the defendant, instructing it to transfer 120,000 rubles from his account through the State Bank to the credit of the Kharkoff Mutual Credit Society for his account, giving in the said letter the numbers of the Kharkoff Mutual Credit Society's account with the Kharkoff Branch of the State Bank. The Russian State Bank was a government institution. It was depositary of the defendant's reserves and had branches in almost every town and hamlet of Russia. Upon receiving this letter from Sokoloff, the Petrograd Branch communicated with the State Bank as follows: "We instruct you herewith to debit our account with the amount of 120,000 rubles, and transfer same to the credit of the account of Kharkoff Mutual Credit Society with your Kharkoff Branch, number so and so, [giving the number] for the account of Mr. Boris Sokoloff."

The transfer was made in accordance with the Giro system, a system which in Russia applied to intercity or intracity transfers. The Giro system is simply a matter of bookkeeping and is explained as follows: " Upon the receipt of the order we debit the client's account to the amount which he requested to be transferred. Our record and our account with the State Bank is credited with the same amount. Then the State Bank, upon receipt of our instructions, perform a similar operation; they debit our account and credit the account of the Kharkoff Branch with the same amount. They send a similar instruction to their Kharkoff Branch, where the system of debits and credits is repeated. Our part of the transfer is complete when we sent out our instructions to the State Bank. The rest of this transfer would be performed in the State Bank Petrograd or the State Bank Kharkoff or the Kharkoff Mutual Credit Society."

A few days later Mr. Sokoloff sent another letter to the Petrograd Branch of the defendant, in which he advised it that he had not received the money as requested in his instructions, and that in view of this fact, the bank was to hold the funds at the disposal of his sister in Petrograd, who would call for them very shortly. Thereupon, the defendant wrote to the State Bank inquiring about the transfer, which replied that it had given instructions to its Kharkoff Branch to make the transfer, and that since then, disorders had broken out between Kharkoff and Petrograd, and it was unable to advise the defendant as to whether the transfer had been made or not, or return the funds. The Petrograd Branch then wrote Mr. Sokoloff and told him that it had already acted upon the instructions in his first letter, had transferred the funds to the State Bank, and that, therefore, it was not in a position to hold them at the disposal of his sister.

The evidence regarding these transactions was given by the parties interested without the production of the original letters or any copies. The contents of the letters

and telegrams were given from memory. There was, however, no dispute regarding the tenor of these communications. Mr. Sikes, an employee of the Petrograd Branch, testified that after receiving the second letter from Mr. Sokoloff, countermanding the transfer to Kharkoff, the communication to the State Bank was as follows: " Please ascertain whether the transfer ordered by us on a certain date on behalf of Mr. Sokoloff has been effective, and if it has not, re-credit us with the amount." In December, 1917, Mr. Sokoloff's sister, following up his letter, called at the Petrograd Branch for his money. " We," says Mr. Sikes, " explained the circumstances to her, and that we had acted upon Mr. Sokoloff's first instructions and therefore did not have the funds there to hold at her disposal. She explained that her brother had not received the funds at Kharkoff, and we endeavored to trace them. * * * The State Bank did not tell us in their letter whether they were going to re-credit or had re-credited us with that money, and I wrote and asked them if the transfer had not been made to kindly re-credit our account with the money. * * * I did not hear anything more about it until the last part of April or the first part of May, when we got a letter from the State Bank in Petrograd referring to our communication before the first of the year, showing that they had just received information from their Kharkoff Branch that the transfer had not been made; that the Kharkoff Branch of the State Bank had not made the transfer to the Kharkoff Mutual Credit Society." Mr. Sikes further states that they never received any communication from the State Bank to the effect that the money had been re-credited to the account of the Petrograd Branch.

I have given the evidence as it appears in the record, for upon it depends the claim of the defendant that these transfers constituted payment.

There may be many instances where an entry upon the books of a bank evidence a completed transaction or

transfer, and constitute payment. (*Baldwin's Bank* v. *Smith*, 215 N. Y. 76; *Briggs* v. *Central National Bank*, 89 N. Y. 182; *Kirkham* v. *Bank of America*, 165 N. Y. 132.) There can be no rule of law that the mere bookkeeping entry in itself constitutes payment. We must always look through the form of transactions and business communications to get the exact facts. (*National Butchers & Drovers' Bank* v. *Hubbell*, 117 N. Y. 384, 389.)

We start these transactions with these fundamental facts. On the books of the State Bank there were many thousand rubles to the credit of the Petrograd Branch. On the books of the Petrograd Branch there were 120,000 rubles to the credit of Boris N. Sokoloff. The Petrograd Branch undertook to pay out this money belonging to Sokoloff. It was not to pay it to the State Bank, but to pay it through the State Bank to the Kharkoff Mutual Credit Society at Kharkoff, Russia. This would be done by entering a credit in the account of that society in the Kharkoff Branch of the State Bank. Therefore, the instructions of the Petrograd Branch to the State Bank were these: " Out of the moneys which you have belonging to us in our account with you, transfer 120,000 rubles to the credit of the Kharkoff Mutual Credit Society at your Kharkoff Branch, and debit our account." The instructions would not be executed until the credit had been established in favor of the Mutual Kharkoff Credit Society in the Kharkoff Branch. The credit was never established, the money was never transferred to Kharkoff. The debit, if made upon the books of the State Bank in the account of the Petrograd Branch, was premature; it was the entry in anticipation of fulfillment, but not an entry of a payment made. If the Petrograd Branch had notified the State Bank to pay 120,000 rubles to a Mr. A., when he should call for them, properly identified, and debit the account of the Petrograd Branch, I can see no reason under the Giro system, as explained, why the Petrograd Branch could not effectually stop payment or counter-

mand the instructions before Mr. A. showed up and got the money. Up until the time that the book entries resulted in some change of position between the parties or the establishment of rights in third parties, they were nothing more than book entries. (*Pratt* v. *Foote*, 9 N. Y. 463, 468; *Consolidated Nat. Bank* v. *First Nat. Bank*, 129 App. Div. 538; affd., 199 N. Y. 516.)

For the reason, therefore, that the transfer directed by the Petrograd Branch had not been completed in accordance with instructions, justifying a debit of its account with the State Bank, there was no effectual payment to Sokoloff of his money with the Petrograd Branch. It is straining at the facts to say that the Petrograd Branch was out any money because of *this* transaction.

There is another reason, in my opinion, why the two banks at the time did not consider these book entries so important. When the Petrograd Branch heard that the money had not gone through to Kharkoff, it notified the State Bank that if the transfer had not been made to Kharkoff, to kindly re-credit its account with the amount; in other words, it countermanded the order, it stopped payment. What position did the State Bank take upon the receipt of this communication? Did it say: " We cannot do this," or " The transaction is closed," or " The payment of 120,000 rubles out of your account must stand to your debit? " Of course not. It immediately replied that because of the turbulent times it could not say whether the Kharkoff Branch had received the instructions and made the transfer, implying, as any one would understand, that if the transfer had not gone through, the request of the Petrograd Branch would be granted. The State Bank followed this up three or four months afterwards by voluntarily notifying the Petrograd Branch that the transfer inquired about had not been made and the credit at Kharkoff had not been established. What is this, if it be not an acknowledgment that the proper book entries had been or would be made? Why should

the State Bank go to the trouble of explaining to the Petrograd Branch its instructions to the bookkeepers? The Petrograd Branch, in effect, said to the State Bank, " If you have not paid out the 120,000 rubles as we directed, stop payment and credit our account." The State Bank replies, " Because of war conditions, we cannot tell whether it has been paid out or not; we will let you know later." Subsequently, it writes the Petrograd Branch that upon investigation it finds the money has not been paid. This implies, if it does not express, the re-crediting of the account of the Petrograd Branch with the money. The liability of the State Bank is undeniable. So much for payment. Now as to the demand.

Sokoloff got his bank book September 1, 1917, showing a deposit with the Petrograd Branch of 133,800 rubles. From time to time he drew out 13,800 rubles; it was a live account. In December he sent his sister to the bank to get the balance. She came two or three times thereafter. Demands were made upon the bank in the spring of 1918. The bank, however, had not yet heard from the State Bank whether the money had gone through to Kharkoff. It learned this in April or May. From December of 1917 on, the bank knew that Sokoloff wanted his money. He or his sister had repeatedly demanded it. There is no evidence that the bank ever notified Sokoloff of the information which it had received from the State Bank, that the credit had not been established in Kharkoff. Its last communication with Sokoloff or his sister was that there was no money in his account: " We had acted upon Mr. Sokoloff's first instructions and therefore did not have funds there to hold at her disposal." The Petrograd Branch left its depositor in this situation. This is the last communication it made to Sokoloff. It never contradicted it, or notified him that because of non-payment at Kharkoff, his account was replenished. How many demands was Sokoloff to make under these circumstances? The duty, to set the matter right, was

upon the defendant; it should have notified its depositor of the situation. The law did not require the branch to communicate with Sokoloff, but from the usual business methods of big banks, the depositor was justified in expecting such a notice. Usual conditions, however, did not prevail in Russia at this time, and we must make proper allowance for the turbulence and confusion following in the wake of revolutions. We must also make the same allowance in behalf of the plaintiff. Whatever demand the law may require in ordinary business transactions before an action can be maintained for the recovery of money, must likewise yield to sense and to reason. Things moved rapidly in Russia in 1918. By September 1, 1918, the Petrograd Branch of the National City Bank had ceased to exist, except as a name. In August its employees had been arrested; by September they had fled the country, or had been expelled. The place of the bank knew it no more; the Soviet government had seized it for other purposes. If Sokoloff had gone to the building which had formerly housed the bank, and demanded money, he would have been shot. Under these conditions, it is a little difficult to understand the position of the defendant in insisting that Sokoloff cannot maintain this action for a breach of contract as of September 1, 1918, because he failed to make a demand on or before that date. The fact that the bank had gone out of business on that date made a demand useless and unnecessary; the law by reason of the contract between the parties will consider the case as if a demand had been made. In other words, that which becomes impossible and useless ceases to be required by the law in cases like this. The implied contract is that the banks shall keep a deposit until called for and until the banks refuse to pay on demand, they are not in default. But where the bank has disclaimed liability, or for any other reason the demand would manifestly be futile, none need be made. (*Holden* v. *Bank*, 77 N. H. 535, p. 538; *Flynn* v. *Ameri-*

*can Banking & Trust Co.*, 104 Me. 141; *McGowan* v. *McDonald*, 111 Cal. 57; *Sickles* v. *Herold*, 149 N. Y. 332, p. 335; *People* v. *Merchants' Trust Co.*, 187 N. Y. 293; *Richmond* v. *Irons*, 121 U. S. 27, p. 64.)

We do not fail to realize that the position of the defendant is equally hard and embarrassing. The contract between Sokoloff and the bank was to pay rubles at the Petrograd Branch whenever he demanded them. (*Chrzanowska* v. *Corn Exchange Bank*, 173 App. Div. 285; affd., 225 N. Y. 728.) They were to be held there, under contract, on his call. Should the bank fail to meet the depositor's demand in Petrograd up to the limit of the deposit, the contract would be broken. When the bank ceased to do business so that Sokoloff, who wanted his money, could not make a demand and could not draw upon his account, the contract was broken. The facts, however, cannot escape us. The bank did not willfully breach its contract; all its property was seized by the Soviet government. Under certain conditions, this also might have justified the defendant in pleading impossibility of performance, the same as the fact excuses the plaintiff from making a demand. The difficulty is that the United States has not recognized the Soviet government, and in consequence, the seizure and nationalization of the banks is not an act of government within the recognized principles of international law. All this has been fully explained in our previous decision and neea not be repeated here.

We, therefore, come to this conclusion: there was no payment, and demand by the plaintiff on or before September 1, 1918, other than had been made was unnecessary, under the circumstances.

The plaintiff, no doubt acting upon the suggestion contained in our previous opinions, elected to treat this case not as one in rescission, but as breach of contract. The contract was broken, as of September 1, 1918, when the Petrograd Branch ceased to function. On that date,

he was entitled to 120,000 rubles in Petrograd. He wanted them and did not get them. His damages are to be measured according to the value of rubles as of that date in Petrograd measured in dollars in New York city, where he has sought his remedy. This has been our ruling in *Gross* v. *Mendel* (171 App. Div. 237; affd., 225 N. Y. 633); *Hoppe* v. *Russo-Asiatic Bank* (200 App. Div. 460; affd., 235 N. Y. 37); *Kantor* v. *Aristo Hosiery Co., Inc.* (222 App. Div. 502; affd., 248 N. Y. 630). The arrangement between the bank and the depositor regarding interest was based upon contract. This arrangement ceased with the breach of the contract, and the allowance of interest from that time according to the legal rate in New York State was proper. (*People v. Merchants' Trust Co.*, *supra; Ex parte Stockman*, 70 S. C. 31.)

The National City Bank was permitted to do business in Russia under the following condition, which was binding upon it and its depositors:

"XXV. The trial of disputes which may arise between The National City Bank of New York and government institutions or private persons with respect to matters concerning the operations of the Company within the Empire must be conducted on the basis of the laws in force in Russia, in Russian judicial institutions."

The General Code of the Russian Empire (Vol. X, part 1, book 2) contains this provision:

"III. On the compensation for damage and losses caused by actions not considered crimes and misdemeanors.

"684. Everyone shall be obligated to compensate for damage and losses caused by his action or neglect, even though said action or neglect does not constitute a crime or misdemeanor; provided it shall be proved that he was not compelled thereto by the stipulations of the law or of the government, or by necessary self defence, or the concurrence of such circumstances which he was unable to avert. March 21, 1851 (25055), III, art. 70."

We think this provision does not vary in essentials from the rule of our own law as to the frustration of a contract. It does not relieve the defendant from the duty of restoring a sum not in excess of the benefit received. (*Sokoloff* v. *National City Bank*, 239 N. Y. 158, pp. 169, 171; *Dolan* v. *Rodgers*, 149 N. Y. 489; Keener on Quasi Contracts, p. 292.) A different case would be presented if there were a claim for something more, *i. e.*, for damages for loss of profit.

The other questions we have considered and agree with the disposition below.

The judgment should, therefore, be affirmed, with costs.

CARDOZO, Ch. J., POUND and LEHMAN, JJ., concur; ANDREWS, KELLOGG and O'BRIEN, JJ., dissent on the ground that the rubles, the subject of the action, have been already paid by the defendant.

Judgment affirmed.