OSCAR L. RICHARD and Others, Respondents, *v.* THE NATIONAL CITY BANK OF NEW YORK, Appellant. (Action No. 2.)

First Department, February 13, 1931.

*Joseph M. Proskauer* of counsel [*John A. Garver, Carl A. Mead, Philip A. Carroll* and *J. Alvin Van Bergh* with him on the brief; *Shearman & Sterling*, attorneys], for the appellant.

*Walter H. Pollak* of counsel [*J. Charles Weschler* and *Charles S. S. Epstein* with him on the brief; *Weschler & Kohn*, attorneys], for the respondents.

MARTIN, J. The essential facts in this litigation having been stated by Mr. Justice McAVOY, it will be unnecessary to repeat them at length.

Although many questions have been raised upon this appeal, in view of the several decisions on this subject, we think there is but one now before us for determination. All the other issues appear to have been disposed of by decision of the Court of Appeals. The question involved which we think is still open, especially in view of the proof in this particular case, is the rule of damages to be applied to the facts here proved. At the outset it may be well to call attention to the fact that the plaintiffs were bound to establish their damages by proper proof. That burden was upon the plaintiffs, not upon the defendant.

The deposit which is the subject of this controversy was made in accordance with an agreement between the parties by the terms of which the defendant agreed to deposit 5,665,000 rubles in its Petrograd branch for the plaintiffs' account. That deposit was made by defendant. The account with the defendant's Petrograd branch was opened in January, 1917. Thereafter, from time to time, the plaintiffs withdrew 4,277,000 rubles. The plaintiffs' deposits and withdrawals left in defendant's Petrograd branch on September 1, 1918, when the branch closed, a conceded credit balance of 1,493,862 rubles. At that time the market price for Romanoff rubles in New York was not less than thirteen cents. The value of rubles in Petrograd was much less. Plaintiffs have recovered judgment for the dollar value of their deposit balance at the rate of rubles *in New York* with interest from the date of closing.

The defendant, upon these facts, concedes that if it is liable at all it is liable for 1,493,862 rubles. The defendant contends, however, that in the absence of any demand other than the bringing of the suit, the value of the ruble deposit must be estimated, not at the time the Petrograd branch was closed but at the time when suit was brought, and it insists that Russia, *not New York*, is the

place to measure the value of the rubles, and that it is the value of Kerensky rubles, not Romanoff rubles, that must determine the amount of its liability. There appears to be no question that the ruble was the Russian monetary unit not only on September 1, 1918, but after that date.

The plaintiffs may not, by bringing an action where the damages may be more favorable, change the rule of damages applicable to such action. *They are entitled to damages, not to a profit.* (*Richard* v. *American Union Bank*, 241 N. Y. 163.) How much were they damaged? If they had rubles in Petrograd on September 1, 1918, or thereafter, bearing in mind the actual circumstances then prevailing, what were they worth there to them? That was their damage, and not what they might receive if the rubles were in some other country and to which country they could not send them.

The plaintiffs contend that the measure of damage is the value of rubles *in New York city* on the 1st day of September, 1918. The appellant contends that the measure of damage is the value of rubles in Petrograd, Russia, on that day, being the time and place of performance and of the breach of contract. Both rely on *Sokoloff* v. *National City Bank* (250 N. Y. 69). The respondents contend that it is an absolutely conclusive authority upon their right to recover damages which they say are to be measured by the value of rubles in New York city on the breach day. The appellant contends that it is decisive in its favor when the decision is properly understood and construed. In that case the Court of Appeals said: " The contract was broken, as of September 1, 1918, when the Petrograd Branch ceased to function. On that date he [plaintiff] was entitled to 120,000 rubles *in Petrograd.* He wanted them and did not get them. His damages are to be measured according to the value of rubles as of that date *in Petrograd* [mark the words ' in Petrograd '] measured in dollars in New York city, where he has sought his remedy. [Mark the words ' where he has sought his remedy.'] "

That decision does not hold that the damages are to be measured by the value of rubles in New York city but by the value *in Petrograd measured in dollars in New York city.* The Court of Appeals then says: " This has been our ruling in *Gross* v. *Mendel* (171 App. Div. 237; affd., 225 N. Y. 633); *Hoppe* v. *Russo-Asiatic Bank* (200 App. Div. 460; affd., 235 N. Y. 37); *Kantor* v. *Aristo Hosiery Co., Inc.* (222 App. Div. 502; affd., 248 N. Y. 630)."

It seems clear that the *Sokoloff* case holds that the value of rubles as of date of breach *in Petrograd, Russia,* should govern in apply-

ing the rule of damages. On that day plaintiffs were entitled to rubles *in Petrograd.*

The cases relied upon by the Court of Appeals and made the basis of the *Sokoloff* decision sustain the defendant's contention.

In the first case there cited, that of *Gross* v. *Mendel* (171 App. Div. 237), Mr. Justice McLAUGHLIN said: " The defendants agreed to pay to the plaintiffs, in Germany, on the dates specified in the respective bills of exchange, the number of marks therein called for. Having failed to do this, the plaintiffs were entitled to recover in United States money — the action being brought here — a sum sufficient to have purchased the marks at the time the defendants agreed to pay them, with protest fees and interest from that time to the entry of judgment, at the rate of six per cent."

That case specifically holds that the plaintiff is entitled to the number of pounds which would have purchased, *at Leipzig, Germany*, the number of marks called for, together with the protest fees. At page 240 the court said: " When the defendants refused payment of the bills of exchange, which they had accepted, the plaintiffs, except for the war then existing between England and Germany, could have immediately drawn upon them at London for the number of pounds which would have purchased, *at Leipzig, Germany*, the number of marks called for, together with the protest fees."

It should be noted that Mr. Justice McLAUGHLIN, writing for this court, also said: " There is no reason, as it seems to me, why a different rule should be applied in the case of foreign money, where a recovery is sought here in our money, than would be applied to contracts for the delivery of *wheat, cotton or other specific articles of merchandise.*"

And at page 241 we find the following: " that the amount to be recovered should be a sum sufficient to purchase the amount of foreign money *at the time and place of the default.* (*Pavenstedt* v. *N. Y. Life Ins. Co.*, 203 N. Y. 91; *Chrysler* v. *Renois*, 43 id. 209; *Scofield* v. *Day*, 20 Johns. 102; *Comstock* v. *Smith*, 20 Mich. 338; *Bissell* v. *Heyward*, 96 U. S. 580.) "

Thereafter in *Hoppe* v. *Russo-Asiatic Bank* (200 App. Div. 460; affd., 235 N. Y. 37) this court said: " We are also of opinion that the measure of damages adopted by the learned trial justice was correct. Plaintiff was entitled to recover a sum sufficient for the purchase of the pounds sterling at the time when the defendant refused to honor the demands of B. B. Hoppe & Co., together with interest from that date to the time of entry of judgment. This was the rule recognized in the somewhat similar case of *Gross* v. *Mendel* (171 App. Div. 237; affd., 225 N. Y. 633), in which the memorandum of the Court of Appeals at page 633 reads as follows:

' The Appellate Division held as a matter of law that all of said bills of exchange were to be converted into money of the United States at the rate of exchange between Leipzig and New York prevailing at the time of maturity of each of said bills of exchange.' "

In the more recent case of *Kantor* v. *Aristo Hosiery Co., Inc.* (222 App. Div. 502; affd., 248 N. Y. 630), this court held that a similar contract was a commodity contract. That is emphasized by. the following language: " The obligation here to deliver pounds sterling in return for hosiery is essentially the same as the obligation in the *Hoppe* case to deliver francs in return for dollars. To differentiate between a debt and a claim for damages is to lose sight of the economic fact that foreign currency is a commodity."

In *Societe Des Hotels Le Touquet Paris-Plage* v. *Cummings* (L. R. [1922] 1 K. B. 451) the court " Held, reversing the judgment of Avory, J., that the debt, being payable in France in French currency, did not cease to be a French debt by reason of its being sued for in England, and as, if the action had been brought in France, the payment made would have been a good discharge of the debt notwithstanding the depreciation of the French franc as expressed in English currency since the date when the money became due, that payment must equally be a good discharge of the debt for the purposes of the English action; and that the plaintiffs were entitled to recover no more than nominal damages for the non-payment at the due date, and the costs of action down to plea pleaded."

In *Deutsche Bank* v. *Humphrey* (272 U. S. 517) the court said: " We may assume that when the bank failed to pay on demand, its liability was fixed at a certain number of marks, both by the terms of the contract and by the German law — but we also assume that it was fixed in marks only, not at the extrinsic value that those marks then had in commodities or in the currency of another country. On the contrary, we repeat, it was and continued to be a liability in marks alone and was open to satisfaction by the payment of that number of marks, at any time, with whatever interest might have accrued, however much the mark might have fallen in value as compared with other things." (See, also, *Hicks* v. *Guinness*, 269 U. S. 71, and *Comstock* v. *Smith*, 20 Mich. 338.)

The plaintiffs were entitled to the value of rubles in Russia on the breach day. If the plaintiffs had been paid their rubles in Russia on the day the bank closed, or at any subsequent day, they would not have had any such value as they now claim or any such value as they have recovered in this action. It was established that there were many ruble transactions at about that time and it was also shown just how much the plaintiffs would have been able to obtain for these rubles if they had them in their possession.

The defendant's evidence showed, substantially without dispute, that at the same time that ruble currency notes were then selling at thirteen cents per ruble in New York city, dollars were being sold in Petrograd on the basis of about four cents per ruble.

The evidence may be summarized as follows:

Link testified that "you got more rubles for a dollar in Russia than you got in New York." As early as June, 1918, "you got twenty rubles for a dollar." There was a very active market in ruble currency for dollars in July and August, 1918, in Petrograd, Moscow and Vologda. The foreign missions, like the American missions, were constantly "dealing in foreign exchange, because they needed millions and millions of rubles to buy commodities in Russia." The American Embassy, the American Consulate, the American Military Mission and American Red Cross in Petrograd and Moscow were dealing in ruble dollar transactions. Link personally testified to a transaction of 600,000 rubles for the American Military Mission on August 20, 1918, which bought rubles for a dollar draft on the Secretary of State of the United States. All of the transactions of these foreign missions were between twenty and twenty-three rubles for the dollar. It was quite a wide market from August 1, 1918, until September 1, 1918. There must have been 100 or 150 such transactions running into quite a lot of money.

Link also testified to a sale of $5,000 for 100,000 rubles to an engineer named Schinz on July 15, 1918.

In July or August, 1918, Link testified that the salaries of the American employees of the Petrograd branch were paid by dollar drafts on the New York branch, and these drafts were sold in Petrograd, Vologda and Moscow. Acting for defendant's employees, he caused to be sold about $12,000 of these drafts at a rate between twenty and twenty-three rubles for a dollar. About twelve of these sales took place on August 15, 1918, in Petrograd. Others took place in Moscow and Vologda.

Koelsch corroborated this testimony as to the Moscow branch, the dollar drafts of the Moscow personnel being sold in August, 1918, for twenty or twenty-two rubles to the dollar. He also saw a number of sales of dollars for twenty or twenty-three rubles to the dollar at the British Club, made up of Englishmen and Americans. The transactions ran into substantial figures.

Shaw, another employee of the bank, was in Tashkent in Turkestan from April to September, 1918. Having sold all his dollar drafts and United States currency, he had to return to Moscow to get more money with which to buy necessities. He got as far as Samara, when he was informed by the American Consul that all the Americans had been forced to leave Moscow. As early as

1917 all the Russians wanted to sell rubles and buy dollars and "you would have to be deaf and dumb not to know what the exchange rate was for dollars." He had to sell dollars in Tashkent in order to live and in August and September he personally sold two checks for about $150 each on the Auburn Trust Company, Auburn, N. Y., for about eighteen or twenty rubles to the dollar and got a better rate, about twenty-two rubles to the dollar, for his $300 in gold eagles. These rates were only for Romanoff rubles. To quote Shaw's own language: "It was a question of bargaining. The rate was 20 or 18 or 20 or 22 or 23 or 24, maybe 25 to the dollar, and whether you could get 18 or 19 or 20 or 21 or 22 would depend upon your ability as a trader." There was a market in Tashkent, in the Bazaar. In fact there was a market anywhere in Russia. Shaw also testified that there were, of course, other transactions about which he had heard in a general way, but the only other transaction which he actually saw was the case of an Irish governess of a Russian family in Tashkent who wanted to convert rubles into dollars and the Russian merchant sold her a $3,000 draft on his agent in New York at the rate of twenty rubles to the dollar in August, 1918.

If the plaintiffs on September 1, 1918, had grain in a warehouse owned by defendant in Petrograd, and defendant on that day converted the grain to its own use, the plaintiffs would be entitled to damages. The damages would be the value of the grain at that time in Petrograd, not the market value of the grain in New York city.

It may be argued that the rubles had no value in Russia, but the proof in this case, practically uncontradicted, is to the contrary. If they were without value that would be plaintiffs' loss. It may be that in the other cases heretofore decided the value of rubles in Russia was not proved, or that question may not have been raised. In fact it may be noted that appellant's counsel asserts that the question here involved was not before the court in the *Sokoloff* case.

It is argued that the defendant bank agreed to respond in damages for any loss sustained by the plaintiffs. The bank did not agree to pay the market value of rubles in New York city. It agreed to pay and is liable for damages, and must pay the damage suffered by the plaintiffs, which is the value of the rubles in Petrograd on September 1, 1918.

We do not see any escape in this case from the conclusion that the rule of damages to be applied is that stated in *Gross* v. *Mendel* (*supra*). In other words, the plaintiffs are entitled to the value of rubles *at the time and place of the breach*, which was Petrograd, on

the 1st day of September, 1918, when the Petrograd branch was closed.

The judgment should, therefore, be reversed and a new trial ordered, with costs to the appellant to abide the event.

DOWLING, P. J., and O'MALLEY, J., concur; McAVOY, J., dissents.

McAVOY, J. (dissenting). The suit was for a deposit made by the plaintiffs in defendant's Petrograd branch bank in Russia, of rubles, Russian money, which sum so deposited the defendant is alleged to have agreed to repay in such amounts and at such times as the plaintiffs might demand, in Petrograd, Russia.

The breach claimed is that on September 1, 1918, the defendant discontinued its business at the branch at Petrograd and failed to designate any agent upon whom a demand could be made, or who was in possession of funds from which to pay demands and it became impossible for plaintiffs to demand or receive from the defendant at Petrograd any part of their balance.

It is alleged that on September 1, 1918, the rate of exchange was thirteen cents, and that their damage was the dollar value of the rubles, i. e., $194,200, with interest from September 1, 1918.

The defenses were as follows:

" I. The agreement of deposit was made in Russia and was to be performed in Russia and hence was governed by the laws of Russia; the laws of Russia provided that force majeure excused performance of a contract in Russia; the Soviet Revolution constituted such force majeure and hence performance in Russia was prevented by force majeure.

" II. The contract and deposit and the promise to repay were made in Russia; by its terms, such deposits were repayable only on demand, and were subject to the Russian law. Under the Russian law, any bank deposit repayable on demand becomes due and payable only on specific demand, and no such demand has ever been made by the plaintiff; by reason thereof, the deposits referred to in the complaint have never become due and all such deposits are now repayable by the defendant in the ruble currency which was legal tender in Russia under the last government in Russia which was recognized by the United States, namely, the so-called Provisional or Kerensky Government, or the dollar value of such currency at the time of such demand.

" III. A tender of the rubles in question to the plaintiffs, in September, 1922, by the head office of defendant in New York was refused."

The plaintiffs opened their account in the Petrograd branch by a direct payment of rubles on June 6, 1917. Between the date

of the opening of the account and September 1, 1918, they deposited over five million rubles and withdrew over four millions and they had a balance as previously stated of 1,493,862 rubles.

No demand was ever made by the plaintiffs on the defendant, either in Petrograd or in New York, for the repayment of this balance or any part thereof.

Plaintiffs assert as their right to recover the value of rubles as of September 1, 1918, because on that day the branch was closed and all business with it rendered impossible.

It is conceded that it was impossible at the time of the closing of the bank to export gold from Russia. Individuals were allowed to take out only 500 Russian rubles, and subsequently in America the Trading with the Enemy Act forbade the exportation or importation of Russian rubles or the transfer of funds for their purchase in the United States. This restriction ran until December 18, 1920.

During that period there was no demand or request of any kind either in Petrograd or New York for the payment of this deposit.

On November 4, 1921, defendant notified plaintiffs that it had elected to close their account and offered to pay their rubles. Plaintiffs refused the offer and said they would allow the matter to lie in abeyance " until Russia is in a less chaotic condition than at present."

Defendant then tendered to the plaintiffs their balance in ruble currency and also its equivalent in dollars at the then market price for such currency in New York, which tender was not accepted.

The first the defendant knew that plaintiffs desired their rubles paid or were willing to take them or their equivalent on any basis was when this suit was begun without any previous demand, on April 7, 1924, over five years after the closing of the Petrograd branch.

Plaintiffs proved the price at which Romanoff ruble notes were sold in New York on September 1, 1918, and the trial court has awarded judgment on the basis of this price at which Romanoff ruble notes were sold in New York on that date.

Defendant asserts in the absence of any demand except the bringing of suit, the value of the ruble deposit must be based, not on the rate at the time the Petrograd branch was closed, but at the time the suit was brought.

It argues that Russia, not New York, is the market in which to measure the value of the ruble and that it is the value of Kerensky rubles that determines its liability.

The plaintiffs contend that the measure of the recovery allowed is the same measure allowed by all the courts in the *Sokoloff Case* (250 N. Y. 69) and as to the time at which values are to be taken.

They assert that the breach day rule is the rule announced by the decisions of this court and the Court of Appeals in *Kantor* v. *Aristo Hosiery Co., Inc.* (229 App. Div. 502; affd., 248 N. Y. 630) and in the *Sokoloff Case (supra).* The argument is that the *Sokoloff* case established the rule that the closing of the Petrograd branch gave the depositor an immediate right to restitution or damages without demand; that the obligation of the defendant's home office is to be determined by New York law, and that the Russian law is no more favorable to defendant than would be the rule in New York; that defendant's tender of worthless rubles in 1921 and 1922 and plaintiffs' rejection of this demand do not affect the measure of damages. They also assert that the *Sokoloff* case established New York as the market for the measure of value and since the option to pay in Kerensky rubles was never exercised, it does not limit the defendant's liability. The latter rule was also made in the *Sokoloff* case.

As to the claim that the closing of the Petrograd branch gave an immediate right to damages without demand, the appellant urges that, since there was no demand, the amount of the recovery is affected only by the beginning of the suit and that the dollar value of the plaintiffs' ruble balance at that time and not when the Petrograd branch closed, is the amount that plaintiffs should recover.

The *Sokoloff Case (supra)* decided that since the contract was to pay rubles at the Petrograd branch whenever demanded, the bank had the right to treat the place of performance as the essential feature of the contract and to refuse to honor any demand made upon it elsewhere than at the Petrograd branch. The depositor had the same right and could, therefore, treat the closing of the Petrograd branch as of itself a termination of the contract entitling him to the restitution of his balance, or a breach of the contract, giving him a right to damages in that amount.

As of September 1, 1918, when the Petrograd branch ceased to function, the right now enforced in this case arose.

Appellant contends that the *Sokoloff* case does not establish a right of action for the closing independent of a demand. It contends that in that case a demand had been made on the Petrograd branch, but the demands in the *Sokoloff* case were either withdrawn or not properly made by check or other draft to close out the account, and Sokoloff in those circumstances did not rely upon any alleged demand in 1917, but upon the closing in 1918, and the Court of Appeals in the *Sokoloff* case based its decision on the broad ground that demand was unnecessary. They say that " the fact that the bank had gone out of business on that date made a

demand useless and unnecessary; the law by reason of the contract between the parties will consider the case as if a demand had been made. In other words, that which becomes impossible and useless ceases to be required by the law in cases like this."

The suspension of the business in 1918 rendered it futile to make at that branch any demand for plaintiffs' deposits and, therefore, such demands were not necessary as a condition of the maintenance of the action, but, in itself, does furnish evidence of a breach of contract to enable plaintiffs to maintain action.

I agree with the rule announced by Mr. Justice MARTIN with regard to the value of the exchange and that it should be measured as of the place where it was intended that the bank was to deposit it; but I believe such rule has been altered, due to the peculiar conditions in Russia at the time of the breach, by the decision in the *Sokoloff Case* (*supra*).

I think that the question whether a demand in New York was necessary is purely a question of New York law, although defendant contends that the doctrine of *force majeure* under the Imperial Russian law governs.

The obligation this action was brought to enforce was the responsibility of the home office for plaintiffs' deposit in Russia, and they rely upon the pledge in the contract of all the defendant's assets to meet plaintiffs' debt. That pledge was reiterated by the defendant's home office in New York, before plaintiffs ever opened their deposit in Russia. The Petrograd branch closing made performance in Russia impossible, and New York became the place of performance. The debt then was to be paid by the defendant at its principal office.

The question whether the right is now enforcible by action in New York is a question of the remedy and, therefore, the law of the forum applies.

Plaintiffs established by indisputable evidence the dollar value of the ruble in New York by quotations recognized as authoritative in the trade. This value, according to these witnesses, at the market price of Russian rubles in New York on September 1, 1918, was not less than thirteen cents. There were said to be twenty dealers besides the banks, and there were for every dealer quantities of customers. Defendant called a dealer as a witness, who confirmed the thirteen-cent price and said that his firm alone had transactions in 1918 amounting to ten million rubles, and the City Bank earlier in the year estimated the number of rubles on the New York market at seventy-five millions.

To the objection that New York is not the proper place to measure value, the answer is that the same objection was made in the

*Sokoloff* case and the referee in that case ruled that " the measure of plaintiff's recovery is the value of the Russian ruble in New York city," and defendant excepted to this conclusion, and to a refusal to find that the price paid in New York for Russian rubles pre-war currency, cash against delivery, is not evidence of the value of plaintiff's rubles deposited in Russia and payable there. The Court of Appeals affirmed the referee's ruling and said that Sokoloff's damages were to be measured according to the value of the rubles on that day; that is, September 1, 1918, in Petrograd, measured in dollars in New York, where the remedy was sought. The *Sokoloff* case disposed of that question and the New York market has been adopted for the measurement. The *Sokoloff* case is not distinguished on the ground that in that case there was no evidence such as was here offered concerning the supposed market in Russia. The question was the same, however, because had defendant been correct in its contention that the Russian market controlled, *Sokoloff's* case would have been left without any proof of the value of the ruble. The attempt to measure the value of the ruble in Russia seems to be a vain task. The Bolshevik Revolution in 1917 paralyzed business in Russia.

I think, therefore, that the value of the ruble as proved in the New York market at that time was the only proper standard of value. It was also held in the *Sokoloff* case that whatever right defendant had to pay plaintiff in Kerensky rubles was lost after September 1, 1918.

The judgment should be affirmed, with costs.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.