The FIRST NATIONAL CITY BANK OF NEW YORK, Appellant,

v.

Whitney GILLILLAND et al., Appellees.

No. 14248.

United States Court of Appeals District of Columbia Circuit.

Argued April 28, 1958.

Decided June 12, 1958.

Certiorari Denied Oct. 13, 1958.

See 79 S.Ct. 61.

Mr. John A. Wilson, of the bar of the Court of Appeals of New York, New York City, pro hac vice, by special leave of court, with whom Messrs. F. Gloyd Awalt, Washington, D. C., and W. V. T. Justis, Herndon, Va., were on the brief for appellant.

Mr. B. Jenkins Middleton, Atty. Dept. of Justice, with whom Asst. Atty. Gen., George C. Doub, Messrs. Oliver Gasch, U. S. Atty., and Samuel D. Slade, Atty. Dept. of Justice, were on the brief, for appellees.

Messrs. Morton Hollander, Atty., Dept. of Justice, and Harold D. Rhynedance, Jr., Asst. U. S. Atty., also entered appearances for appellees.

Before EDGERTON, Chief Judge, and BAZELON, Circuit Judge, and MADDEN, Judge, United States Court of Claims.[*]

MADDEN, Judge.

This is an appeal from a judgment of the District Court dismissing the appellant's action for want of jurisdiction. The basis for the order of the District Court was that an applicable statute expressly denied resort to the courts.

Before the Russian revolution of 1917, the appellant bank had ruble deposits in the Russo-Asiatic Bank, one of the largest banks in Russia. Russo-Asiatic had dollar deposits in appellant bank and other banks in New York City, particularly the Guaranty Trust Company. The new Soviet Government, when it seized power, nationalized the banks in Russia, and repudiated the obligation of those banks to pay their depositors. Russo-Asiatic, however, continued to do business through its branches in England, France, and China.

Appellant says that in January 1918 it had on deposit in Russo-Asiatic in Petrograd rubles worth $537,515.80; that it demanded payment and payment was refused. At that time Russo-Asiatic had on deposit with appellant in New York $2,261,981.72. Subsequent withdrawals reduced this amount to $232,-623.66 by 1925. The appellant does not clearly indicate why it permitted these withdrawals rather than paying itself out of the funds on deposit.

In 1932 the appellant decided to reduce to judgment its claim against Russo-Asiatic and collect it out of Russo-Asiatic's assets which might be found in New York, including the $232,623.66 which Russo-Asiatic still had in appellant's own bank. Decisions in the State courts of New York, particularly the decision of the Court of Appeals in Sokoloff v. National City Bank, 239 N.Y. 158, 145 N.E. 917, 37 A.L.R. 712; Id., 250 N.Y. 69, 164 N.E. 745, established the doctrine in those courts that the Soviet nationalization of the banks was not a defense to a suit brought elsewhere against a bank on account of the refusal of its branch in Russia to pay its depositors. The appellant desired, therefore, to have its suit litigated in the State courts of New York. If it had, itself, sued in a New York court, Russo-Asiatic, a non-citizen of New York, could have removed the case to the Federal courts. The appellant, therefore, assigned its claim to one Grant, a resident of New York but a national of Great Britain. A suit by Grant against Russo-Asiatic could not be removed to the Federal courts, since both were non-citizens.

The assignment to Grant was, as written, absolute. If it was to serve the purpose for which it was made, it must have been intended to be absolute, since the Constitutional provision that the jurisdiction of the Federal courts shall extend to controversies between citizens of a state and citizens of a foreign state, and the statutes implementing that Constitutional provision cannot be frustrated by the interposition of a nominal party for the sole purpose of placing jurisdiction in a court of the real owner's preference.

In Grant's suit against Russo-Asiatic substituted service by publication was used, and there was attachment of Russo-Asiatic's deposits in appellant's bank and in Guaranty Trust Company's bank. Guaranty Trust Company made a return to the service of the attachment upon it stating that it had no funds of Russo-Asiatic in its bank. Appellant made a return stating that it had $232,623.66 belonging to Russo-Asiatic. On April 1,

[*] Sitting by designation pursuant to provisions of Sec. 291(a), Title 28 U.S.Code.

1933, Grant took a default judgment for $537,515.80 plus interest and costs, the total judgment being $1,031,757.25, against Russo-Asiatic. Appellant paid its $232,623.66 to Grant, who, after deducting attorney's fees and expenses, paid over the balance, $227,505.53 to appellant. That amount was credited as a partial satisfaction of Grant's judgment. On August 23, 1933, Grant assigned all his rights in appellant's claim against Russo-Asiatic to appellant.

Guaranty Trust's return in Grant's attachment suit stating that it owed Russo-Asiatic nothing was proved inaccurate by the decision in 1947 in Steingut v. Guaranty Trust Co., D.C.S.D.N.Y., 58 F.Supp. 623, affirmed 2 Cir., 161 F.2d 571, certiorari dismissed on motion of petitioner's counsel 332 U.S. 753, 68 S.Ct. 81, 92 L.Ed. 339. We shall refer hereinafter to that litigation.

On November 16, 1933, the President of the United States recognized the Soviet Government of Russia, and in connection with this recognition the Litvinov Assignment was executed. By that instrument, the Soviet Government assigned to the United States all claims which the Soviet Government owned in the United States. Since the Soviet Government had nationalized the Russian banks, it owned the deposits which those banks had in banks in the United States, one of which was Russo-Asiatic's deposit of $3,364,000 in Guaranty Trust in New York. In the Steingut case, cited above, in which the suit was brought under the Litvinov Assignment, it was held that Guaranty Trust was not entitled to set off the amount which it had lost because of the refusal of Russo-Asiatic to pay it its ruble deposits in Russo-Asiatic's Petrograd branch. The United States recovered a judgment of $3,364,939.69 in Steingut, all of which was paid into the Treasury in 1947 and 1948. In the Steingut litigation a number of persons who had levied attachments on Russo-Asiatic's deposits in Guaranty Trust intervened to protect their attachment liens. The appellant did not intervene. It says that it did not do so because the United States in that litigation was testing the question whether Guaranty Trust owed Russo-Asiatic anything, and appellant's intervention would have been for the same purpose, and hence useless. This is a remarkable explanation of appellant's indifference to the Steingut suit. The purpose of that suit was not merely to test a legal question, but to collect the money, if any, which Guaranty Trust owed Russo-Asiatic, and put it into the Treasury of the United States. But that was the same money which appellant now says it owns, and has owned ever since its 1932 attachment was levied. It says that it stood by and allowed the Government to carry off its money because it anticipated that the Government would use the money to reimburse its nationals who suffered losses due to Soviet nationalization.

The United States during some eighteen years of investigation and litigation was able to collect some $9,000,000 as a result of the Litvinov Assignment. In 1955 Congress provided by statute for the distribution of this fund. By the Foreign Claims Settlement Commission Act of 1955, 69 Stat. 562, section 302, 22 U.S.C.A.Supp. IV, 1641a, Congress appropriated this money into a Soviet Claims Fund. It gave to the Foreign Claims Settlement Commission, a tribunal which had been set up in 1949 to administer a Yugoslav fund, the task of receiving and determining the validity of claims against the Soviet Fund. Two kinds of claims were to be considered. The first was claims against the Soviet Government arising prior to November 16, 1933, and the second was certain claims against Russian nationals whose property had been collected by the United States pursuant to the Litvinov Assignment. Claims of the latter type were given priority of payment if they met the conditions laid down in section 305 (a) (1) of the statute, 22 U.S.C.A.Supp. IV, 1641d(a) (1). The conditions were that such a claim had to be a claim of a national of the United States against a national of Russia; there must have been a judgment or an attachment, founded on the claim, issued out of a court of the United States in favor of a national of the United States; and a lien must have,

pursuant to the judgment or attachment, been obtained prior to the date of the Litvinov Assignment, upon property collected by the United States after and pursuant to the Assignment.

Section 314 of the statute provided:

"§ 314. The action of the Commission in allowing or denying any claim under this title shall be final and conclusive on all questions of law and fact and not subject to review by any other official of the United States or by any court by mandamus or otherwise, and the Comptroller General shall allow credit in the accounts of any certifying or disbursing officer for payments in accordance with such action." (22 U.S.C.Supp. IV, 1641m).

The appellant filed a claim with the Foreign Claims Settlement Commission for the $799,133.59, the part of the Grant judgment hereinbefore described which remained unsatisfied, asserting that this claim satisfied the conditions above recited for allowance as a preferred claim. The Commission issued a "Proposed Decision" denying the claim and stating reasons therefor. The appellant appeared before the Commission and argued at length and was interrogated by the Commission. In its final decision the Commission adhered to its denial of the claim. In the decision it indicated its doubt as to the existence of the alleged oral trust in Grant for the benefit of the plaintiff, but then said "However, in our judgment, other propositions are determinative of this matter." It then pointed out that the warrant of attachment was not issued "in favor of" a national of the United States, and a lien was not obtained by a national of the United States pursuant to the attachment and judgment.

The appellant says that since it was the beneficial owner of the claim held by Grant, the attachment and the lien were "in its favor" and the statute was satisfied. The Commission did not find that the plaintiff was the beneficial owner, but it apparently intended to hold that even if appellant was the beneficial owner, still, because the attachment and judgment and lien were obtained by Grant, the conditions of section 305(a) (1) were not satisfied.

■■ If the Commission did so hold, it may have been an error of law, an unjustified elevation of form over substance. But section 314 makes the actions of the Commission "final and conclusive on all questions of law and fact, * * *." The appellant says that what it asserts to have been an error of law was more than that, that it was a redefinition of the Commission's jurisdiction by excluding from the benefits of the statute a class of persons meant to be covered by the statute, i. e., beneficiaries of naked trusts. The appellant relies upon certain decisions of the Supreme Court to the effect that an administrative body may not determine the limits of its grant of authority. Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718; Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598. In none of those cases was there an express statutory provision that the actions of the administrative body should be unreviewable. There is no constitutional problem with regard to this point in the appellant's argument. Congress could have expressly disqualified beneficiaries of oral trusts from the benefits of the statute, hence, if its delegate with unreviewable power denies those benefits to such persons, it has not violated the Constitution. de Vegvar v. Gillilland, 97 U.S.App.D.C. 126, 228 F.2d 640, certiorari denied 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859; Haas v. Humphrey, 100 U.S.App.D.C. 401, 246 F.2d 682, certiorari denied sub nom Haas v. Anderson, 355 U.S. 854, 78 S.Ct. 83, 2 L. Ed.2d 63; American & European Agencies, Inc., v. Gillilland, 101 U.S.App.D.C. 104, 247 F.2d 95, certiorari denied 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed.2d 114.[1]

---

1. These cases interpreting the nonreviewability clause of the International Claims Settlement Act say courts could intervene where constitutional rights have been violated, but none of the cases involved such a situation.

The appellant says that, by the Grant attachment which became a lien under the law of New York, it acquired a property right in the claim of Russo-Asiatic against Guaranty Trust. It says that the refusal of the Commission to award it, out of the Soviet Claims Fund, an amount equivalent to the unsatisfied part of its judgment, is a taking by the Government of its property without compensation, and is unconstitutional. It will be remembered that the plaintiff caused the Grant attachment to be made in 1932; that Guaranty Trust reported that it held no assets of Russo-Asiatic; that the Litvinov Assignment took place in 1933; that the Government as assignee sued Guaranty Trust in 1947 for what Guaranty Trust had owed Russo-Asiatic ever since 1918, proved that it did owe something, recovered and collected a judgment and put the money in the Treasury. Then, if ever, the appellant's property was taken. At that time the appellant could have urged that what it became the owner of by its attachment in 1932, Litvinov could not assign to the United States in 1933. If the appellant concluded that the part of wisdom was to refrain from asserting its property right in the 1947 litigation, because its lien would follow the funds into the Treasury of the United States, it did not follow up that thought by suing the United States, but let the statute of limitations run against its claim.

Between 1947, when the *res,* to which the plaintiff's asserted lien had been attached, disappeared into the Treasury, and 1955 when Congress enacted the scheme for paying Russian claims, there was no property relation whatever between the appellant's claim and any money in the Treasury. When Congress enacted the 1955 statute providing for the payment of Russian claims and granting a preference to claimants whose claims had a certain history, it was not thereby granting a new or reviving an old property interest in any money in the Treasury. It was only passing a law providing that money should be paid to certain persons if they satisfied certain conditions. It could with equal constitutionality have kept the money collected in the Litvinov Assignment in the Treasury, or provided for its distribution according to a wholly different scheme. As the Commission well said, the collection of the Litvinov Assignment money was not its task nor its responsibility. If in its collection, property rights were impaired, relief would have had to be sought elsewhere. The Commission's task was to distribute it according to the statutory scheme, as it understood that scheme.

The action of the Commission was not reviewable in the District Court, and that Court was right in dismissing the appellant's complaint, and its action will be affirmed.