## THE ANNA R. HEIDRITTER.

### (District Court, D. Massachusetts.   April 3, 1923.)

### No. 1839.

1. **Maritime liens** ⊛⟶27—**Money held advanced on credit of vessel.**

    Advancements by ship brokers and ship agents *held* made solely on the credit of the vessel.

2. **Maritime liens** ⊛⟶7—**Sums advanced must be expended for some necessity.**

    The essential elements of a "maritime lien" include the necessity for the repairs, supplies, or advances and their actual use and benefit received by the vessel, and it is not the law that, if the lender to the captain of a vessel acts in good faith and properly satisfies himself that the loan is necessary for the vessel, he need go no further, but would have a lien, even if the captain squanders the money.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Maritime Lien.]

3. **Maritime liens** ⊛⟶14—**Navigation fees, pilotage, and telephone calls held lien items.**

    Shipbrokers were entitled to liens for navigation fees, inward pilotage, and telephone calls paid on the credit of a vessel.

In Admiralty.   Libel by Robert Wilcox against the schooner Anna R. Heidritter.   On petition of Crowell & Thurlow to intervene.   Petition sustained in part, and disallowed in part.

Edward S. Dodge, of Boston, Mass., and Burlingham, Veeder, Masten & Feary, of New York City, for libelant.

Harrington, Bigham & Englar, of New York City, and Blodgett, Jones, Burnham & Bingham, and Arthur S. Jones, all of Boston, Mass., for petitioner.

PETERS, District Judge.   This matter was heard on the petition of Crowell & Thurlow to intervene for their interest in the sum of money realized from the sale of this schooner by order of court and now deposited in the registry.   To this and other claims against the vessel, or the proceeds of its sale, aggregating something more than the amount realized, the owners make no defense.   Other claimants defend this petition.

I find the following facts pertinent to the issue:

Crowell & Thurlow are shipbrokers and ship agents, of Boston. They were not the general agents of this vessel, nor did they act in that capacity.   They had no funds of the owners in their hands, nor had they previously any business with the owners concerning this vessel.

The schooner in question arrived at the port of Boston from Africa with a load of mahogany in April, 1920.   The captain came to the office of the petitioners, introduced himself, and asked if he could get money to "disburse the vessel, pay off crew," etc.   An employee of the petitioners called by telephone the office of the owners of the vessel in New York and inquired whether it was desired that money should be advanced the captain for the purpose mentioned.   The reply was in

⊛⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the affirmative. Up to this time the petitioners had not heard of the owners of the vessel, and knew nothing and made no inquiry about their credit, nor had they any information as to any funds the owners might have in Boston.

The petitioners advanced money to the captain and upon his request, as follows:

April 15, $6,355.99, to captain.
April 20, 500.00, to captain.
April 14, 42.10, navigation fees paid.
56.00, inward pilotage paid.
7.15, telephone calls to New York.

Following this, or about the same time, petitioners also performed some slight services for the vessel, entering her at the custom house, seeing that she was discharged and ordering a few supplies. It does not appear that any charge was made for this. A few other bills were also presented against the schooner but were not paid. On April 20, she was seized by the marshal. An employee of the petitioners testified that $6,000 or $7,000 was not thought to be an unusual sum for a vessel to require upon her arrival from Africa.

The records of the shipping commissioner, produced at the trial, showed that the seamen of the Heidritter were paid off at Boston after the voyage from Africa and mutual releases signed on April 15, 1920; the amount received by the seamen being $4,855.99.

[1] I am satisfied that the advancements were made solely on the credit of the vessel.

The three small items were paid directly, and there is no question about the application of the money.

A question is raised as to the application of the $6,855.99 advanced to the captain; but it was asked for and advanced for the principal purpose of paying off the crew. At the time it was advanced the petitioners called up the owners in New York and asked if the money should be advanced for that purpose. On the same day $4,855.99 (the exact sum advanced the captain that day less $1,500) was paid the crew in full for their wages, and, while the nonproduction of the captain as a witness is criticized, I think it is a fair inference from all the circumstances that the crew was paid from the money advanced by the petitioners for that purpose.

There is, however, no evidence whatever as to what the remaining $2,000 was used for, and consequently I cannot find that any part of it was used for the benefit of the vessel. The captain might have absconded with it for all that appears here. As mentioned, the captain did not testify as a witness, and we are without information as to the $2,000. It is not sufficient to show the advancement of money to the captain of a vessel. To give rise to a lien the petitioners must show that it was necessary and was used for the payment of bills, which, if unpaid, would be liens against the vessel. The Avalon (D. C.) 169 Fed. 696; Piedmont Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, 41 Sup. Ct. 1, 65 L. Ed. 97.

[2] The petitioners rely upon the case of Southern Bank v. Alexander McNeil, Fed. Cas. No. 13,186, which does hold in effect that if

the lender to the master acts in good faith and properly satisfies himself that the loan is necessary for the vessel, he need go no further, but would have a lien even if the master squanders the money.

I cannot accept this as law at the present time in this district.

The essential elements of all maritime lien include the necessity for the repairs, supplies, or advances and their actual use and benefit received by the vessel.

In the case of the $2,000 which is unaccounted for, it does not appear that that sum or any part of it was necessary or that any benefit from it inured to the vessel. The sums advanced must be expended for some necessity of the vessel, the indebtedness for which would constitute a lien on the vessel.

In the case of The Avalon, above mentioned, the opinion of Dayton, District Judge, states:

"In this case the claims of these banks are sought to be established as maritime liens substantially alone upon the testimony of the ship's master that the sums loaned were used in the operation of the boat. There is no attempt made to show the individual parties to whom the sums were paid, the character of either the labor, material, or supplies furnished by them; nothing in short, to inform us as to whether the claims paid with these moneys were in themselves true maritime liens. There is no attempt to show that these banks made any effort, at the time these loans were effected, to see to the application of the money to the payment of maritime liens, as to which alone subrogation in their favor would be enforceable."

In the case of The Puritan, 258 Fed. 271 (District Court, District of Massachusetts, 1919), the master of the vessel applied to the libelants for advances, stating that, if not made, the vessel must abandon her voyage. The necessity for advances actually existed. In this case the libelants were also the agents of the vessel, the amount of their recovery being limited by the following statement in the opinion by Judge Morton:

"I therefore find and rule that the libelants are entitled to a lien for so much of their advances to the master as was used to pay claims on which the creditors would have been entitled to a lien against the schooner, and that the libelants are also entitled to a lien in respect to such payments as they themselves made directly to creditors whose claims would have entitled them to a maritime lien."

See, also, The Maud Palmer (D. C.) 224 Fed. 654.

It follows that in the instant case the libelants are entitled to maintain their petition to intervene for so much of their advances to the master of the vessel as was used to pay claims which would otherwise have been a lien against the vessel, and that they are also entitled to bring within the same category the payments they made directly to creditors, whose claims would have entitled them to a maritime lien.

[3] I find that all but $2,000 of the amount claimed by the petitioners is covered by this ruling. As to the smaller items of pilotage, etc., being lien items, see the case of The Ascutney, Spice v. U. S. (D. C.) 278 Fed. 991, where Judge Rose allows, under somewhat similar circumstances, as lien items, pilotage bills and taxicab bills.

The petition is sustained for $4,961.24, with interest from its date, and disallowed as to the balance.