GALATIS et al. v. GALATIS.

No. 6171.

Circuit Court of Appeals, Fifth Circuit.

Feb. 4, 1932.

Rehearing Denied Feb. 26, 1932.

572

Norris McElya, of Miami, Fla., for appellants.

A. C. Franks, of Miami, Fla., for appellee.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge

Andrew Galatis and Albury & Company appeal from an adverse decree in admiralty. Andrew Galatis as master, with certain others as seamen, libeled the British vessel Miss Nassau for their wages. Albury & Company filed an intervening libel claiming a lien for advances and supplies furnished to the vessel. In due time William Galatis as owner and claimant filed exceptions and answers to each libel, but omitted to file formal claim and give the stipulation for costs and expenses required by Admiralty Rule 25 (28 USCA § 723). The libelants moved for default decrees, but the court permitted a claim and stipulation to be filed nunc pro tunc. This was within the discretion of the court. Under Admiralty Rule 28 (28 USCA § 723) the default, if it had been entered, could have been opened; and Admiralty Rule 23 (28 USCA § 723), permitting amendment of libels to save them from dismissal, applies in its spirit to defensive proceedings also. There was no error in the court's action.

The case was referred on motion of claimant and over objection of libelants to a commissioner to take testimony and make findings of law and of fact. This was not an abdication by the judge of his office, but a procedure authorized by Admiralty Rule 43 (28 USCA § 723). The report when made was not binding on the court but advisory only, and subject to exception by the libelants. The main questions were matters of account, for which the court could ill afford time. There was no error in the reference. Lee v. Thompson, Fed. Cas. No. 8202; Shaw v. Collyer, Fed. Cas No. 12718; Baltic Cotton Co. v. U. S. (C. C. A.) 55 F. (2d) 568.

In the final decree the relatively small amounts found in favor of some of the seamen were adjudged to be recovered from the owner, and to be a lien against the vessel, which was to be sold to pay them if the owner did not within thirty days. A decree in personam is inappropriate to libels in rem, but William Galatis, against whom it was rendered, is not complaining. The libelants who appeal are in no position to complain of the form of a decree in which they have no part. Moreover, since in the decree no execution was awarded against William Galatis, there was after all only an opportunity extended to him to save a sale by early payment such as is always extended in a mortgage foreclosure in equity, which is generally a proceeding in rem. We think it not amiss.

Some of the seamen were, as stated, awarded a recovery, but much less than claimed by them. They, however, do not join in this appeal. Three others who are joined were awarded nothing. No one of these appeared at the trial to testify, and each was shown to have disappeared before the libels were filed The master's testimony as to what was due them was very unsatisfactory, and the testimony for the claimant was to the effect that two of them were not seamen and performed no duties on the vessel, and the third had been fully paid off. The decree as to these was fully justified.

The claim of lien by the master and by Albury & Company is affected by the ownership of the vessel and their relationship to her. They excepted to the claim of William Galatis and alleged that the title to the vessel was in a British corporation, Nassau Navigation Company, Ltd., at Nassau, Bahama Islands. The claimant pleaded that the master and Albury & Company by collusion and

fraud had taken possession of his vessel and operated it against his will, and were now seeking to bring unjust claims against it to force its sale. The commissioner reported that the claimant was the sole owner, and the judge adopted the view that the claimant and master were joint and equal owners, both considering the Nassau Navigation Company, Ltd., to be an insubstantial paper corporation created for convenience in the operation of the vessel. While the evidence is not altogether clear, we think the truth to be as follows: The claimant William Galatis with two others bargained for the vessel from one De Rocher, but before taking title bought out his co-owners. He was refitting the vessel, being a mechanic, and agreed with his brother Andrew that the latter should be master and should "share with him 50-50 in operating the boat." Andrew put no money into it. William was an American citizen, but it was desired to keep the vessel British for convenience and economy in her operation between Miami and Nassau. On the advice of Albury & Company, who were to and did act as the ship's agent at Miami, the British corporation was formed at Nassau for the sole purpose of taking title to the vessel and operating her, and title was passed from De Rocher not through William but through Andrew, who was not an American citizen, and through one of the Alburys, an Englishman, to the British corporation and the vessel was registered as British. The corporate stock is testified to be held one-half each by William and Andrew with probably a few qualifying shares outstanding in directors at Nassau. It was never the intention of William to give Andrew a half interest in the ship, but only in her operations, and as between William, Andrew, and Albury & Company, all of them familiar with the whole arrangement, the sole ownership remained equitably in William. Making headquarters at the wharf of Albury & Company, the vessel made six voyages to Nassau and return before March 1, 1930, with Andrew as master and William as engineer. On that day friction between the brothers came to open rupture, and William, in the presence of the manager of Albury & Company, ordered the ship tied up, and later, after a fight, discharged the master and the crew and locked the engine room. Andrew, however, broke open the engine room, took the vessel again in charge, hired another engineer, and made eleven other round voyages between March 1 and May 7, 1930, when William libeled the vessel to recover it as owner. A month later,

pending that suit, the libels involved in this appeal were filed, Andrew claiming wages for a period long antedating the first voyage, and Albury & Company claiming a lien for advances and supplies during the last eleven voyages, having been settled with for the first six. Without holding him to be such, we will treat Andrew as the master of a British vessel, and entitled to a lien which the British law allows but the American denies. 1 Benedict, Admiralty, § 80. We agree with the District Court that he has proven no claim. We think the more credible evidence is that he was working for half of the profits rather than for fixed wages in addition, and no profits have been shown. Since March 1, 1930, he was not under any employment by the real owner of the vessel.

■ Although denied by them, the circumstances strongly indicate that Albury & Company were really the general agents of the ship. Such have been held entitled to no lien for advances and bound to look alone to the owners employing them. Esteban de Antunano (C. C.) 31 F. 920; The Raleigh (D. C.) 32 F. 633; The M. Vivian Pierce (D. C.) 48 F.(2d) 644. A general contract with Albury & Company has not, however, been proven, and they dealt, so far as appears, exclusively with the master. It may be that even a general agent, unless his agreements with the owner amount to a waiver of the lien under 46 USCA § 974, as explained in W. A. Marshall & Co. v. The President Arthur, 279 U. S. 564, 49 S. Ct. 420, 73 L. Ed. 846, may now have a lien under the broad language of 46 USCA § 971: "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." The entire advances claimed are for the voyages after Andrew took the vessel from William's control, and about half of them are charged up on the day and the day following that on which William as owner libeled the ship to recover it. While the evidence is confused and contradictory, we are convinced that Albury & Company were well aware of the situation and should not have relied upon Andrew's presumed authority to bind the vessel as master under 46 USCA § 972. In establishing that presumption the section expressly provides:

"No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel." And section 973 declares: "Nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." Andrew refers loosely to employment as master by the Nassau Navigation Company, but the only contract he definitely mentions was that with his brother before that company was ever organized. After March 1st Andrew was no longer rightful master, and Albury & Company, if they did not know it, knew enough to require that they ascertain his status.

But it is urged that some of their advances discharged valid liens on the vessel to which they succeed by subrogation independently of the authority or request of Andrew. The largest of these items relates to a libel filed in April against the vessel by Manilatus, one of William's former associates, for $400 balance of purchase money. Three hundred dollars appears to have been laid out in counsel fees and expenses to obtain release of the vessel on stipulation in order that she might proceed on her voyage. This was done without the knowledge and consent of William and with no apparent benefit to him, for it is not shown how the libel was disposed of and he testifies that he still owes the $400 to Manilatus. Other items, as for head tax advanced, would never have been incurred except for the unauthorized use of the ship, and these ought to be discharged out of the freight. The aggregate of all advances which could in any way have been liens on the vessel has been in fact more than repaid by collections of freight by Albury & Company and by remittances to them by Kelly Lumber Yard, the ship's agent at Nassau, during the period in dispute. We hold that they have established no lien against the Miss Nassau for advances between March 1 and May 8, 1930. The exact relation of Kelly Lumber Yard to Nassau Navigation Company, Ltd., does not appear. No prejudice results to any general accounting that may be proper between them and Albury & Company in respect to these eleven voyages. See Minturn v. Maynard, 17 How. 477, 15 L. Ed. 235.

Judgment affirmed.