**THE MARET**

No. 8450

Circuit Court of Appeals

Third Circuit

Argued January 7, 1944

Decided October 17, 1944

*See, also, 145 F.2d 431*

422

PERRY A. BECK, New York City (DENZIL NOLL, St. Thomas, Virgin Islands, on the brief), *for appellant*

CHARLES RECHT, New York City (OSMOND K. FRAENKEL and HYMAN OPPENHEIM, both of New York City, on the brief), *for respondents*

Before BIGGS, JONES, and GOODRICH, *Circuit Judges*

BIGGS, *Circuit Judge*

The S.S. Maret, a ship of Estonian registry the beneficial ownership of which apparently rested in a number of Estonian citizens in a shipping copartnership under the style of "Tallinn Shipping Company, Ltd.",[1] arrived at the Port of St. Thomas in the Virgin Islands July 27, 1940[2]. The Maret had been engaged in carrying bauxite from Georgetown in British Guiana to St. Thomas. J. H. Winchester & Co., Inc., of New York City (hereinafter referred to as "Winchester") were her general agents. The Maret was under a time charter to Saguenay Terminals, Ltd. (hereinafter referred to as "Saguenay"), which required delivery of the Maret at a safe port north of Cape Hatteras.[3]

On June 17, 1940, the armies of the Union of Soviet Socialist Republics occupied Estonia and thereafter the Soviet Socialist Republic of Estonia was created. The Soviet Republic of Estonia promulgated certain decrees

[1] It is impossible on the record before us to ascertain the ownership of the vessel even prior to the occupation of Estonia. No finding of fact as to this issue was made by the court below.

[2] See appendix p. 24.

[3] A rider attached to this charter, designated "Baltime 1920 War Risks Clause", provided in part, "Steamer not to be sent on any voyage before Owners have been able to cover her full value against war risk". Libelant's Exhibit 12-A. Whether or not this charter had expired is not clear from the record.

 We will give each exhibit the precise designation given to it in the court below. Inconsistencies and imperfections in designation and labeling of exhibits will be noted due in part at least to the introduction of most of the exhibits from the possessory libel action (at No. 29 - 1940 in the District Court of the Virgin Islands). See note 8, infra.

and enacted various statutes[4] which purported to nationalize ships of Estonian registry. An Estonian State Steamship Line was organized pursuant to a decree promulgated on October 29, 1940, by the People's Commissar of the Maritime Fleet.[5] By a proclamation published in the Estonian State Gazette[6] the Maret was transferred to the Estonian State Steamship Line. On July 19, 1940, a time charter was executed between "The Tallinn Shipping Company, Limited" as "owners" of the Maret and All Union Chartering Company (hereinafter referred to as "Sovfracht"),[7] a juridical entity or corporation organized under the laws of the Union of Soviet Socialist Republics. Sovfracht is the agency employed by the Soviet Republics and by the Estonian State Steamship Line for the chartering of vessels. The charter referred to provided for one "Far East round voyage", the charterer to supply bunkers and supplies. It was stipulated by the parties that Amtorg Trading Company (hereinafter referred to as "Amtorg"), a New York corporation, acted as "agent" for Sovfracht in connection with the Maret.[8]

On or about July 31, 1940, the Maret being at St. Thomas, her master, Captain Jakob Hall, received from Winchester information that the Maret had been nationalized. Hall thereupon cabled Amtorg for instructions. Amtorg by a

[4]See for example Claimant's Exhibit A-12, Claimant's Exhibit B-13 and Claimant's Exhibit E-16.

[5]See Claimant's Exhibit D-15.

[6]The "Riigi Teataja." See Libelant's Exhibits 113 and 122.

[7]"Sovfracht" is simply the cable name of All Union Chartering Company. We will use this designation since All Union Chartering Company is frequently thus referred to.

[8]A stipulation entered into by the parties at No. 29 - 1940 in the District Court of the Virgin Islands (this suit being a possessory libel referred to more specifically at a later point in this opinion), provides inter alia, "That the English name of Sovfracht . . . is The All Union Chartering Company, and is an independent juridical entity organized under the laws of the Union of Soviet Socialist Republics, . . . under the general control of the People's Commissariat of Foreign Trade, which Commissariat is a governmental body; and that the Amtorg Trading Corporation acted as agent for Sovfracht in connection with the . . . Maret."

cablegram dated August 7, 1940, ordered Hall to procure bunkers and supplies and to proceed immediately to Murmansk. Hall then cabled Amtorg and asked for instructions as to the disposition of the charter party made with Saguenay, having in mind that clause of the charter providing that the Maret should be delivered to a safe port north of Cape Hatteras. He was instructed by Amtorg to disregard the provisions of the charter. Hall then cabled for instructions to certain individuals whom he considered to be the managers of the Maret and received contradictory directions from certain of them.[9] He then decided to take the Maret to Murmansk and requested advances from Amtorg to pay his crew and himself and to buy supplies, including bunkers for a "six thousand mile" voyage. The nature and dates of these advances will be discussed at a later point in this opinion.

On August 5, 1940, the Honorable Johannes Kaiv, acting Estonian Consul General at New York City, directed Hall to disregard any instructions to take the Maret to Murmansk. Since Hall was uncooperative, on August 13, 1940, Mr. Kaiv, acting purportedly pursuant to the authority of Article XXII of the Treaty between the United States and Estonia signed on December 23, 1925, 44 Stat. 2387,[10] and Paragraph 84 of the Estonian Consular Law,[11] sent him a cable dismissing him as master of the Maret. On September 17, 1940 the Consul General ap-

[9] See Exhibits Nos. 21 and 23. It does not appear whether these exhibits were introduced by the libelant or claimant in the suit at No. 29 - 1940.

[10] See "Treaty Series, No. 736," published by the Government Printing Office at Washington, D. C. We take judicial notice of this treaty.

[11] See Libelant's Exhibit No. 107, p. 9, as follows:

"If, on the complaint of the crew or in any other manner, the Consul shall ascertain that a master is not fitted to be in charge of a vessel without manifest peril to the crew, the vessel or its cargo, he shall immediately report the matter to the owner of the vessel or to the latter's local agent.

"If, due to circumstances, it is impossible to await the arrival of instructions from the owners of the vessel the Consul may discharge the master of the vessel and replace him provisionally by another master."

pointed Captain Leopold Truberg, an Estonian citizen and apparently one of the beneficial owners of the Maret, as her captain. Hall, however, refused to relinquish his command to Truberg and Truberg never took command of the ship.

At various times during the dispute as to ownership and control of the Maret, powers of attorney were executed by individuals who were among the beneficial owners of the Maret. In certain of these powers of attorney Mr. Kaiv as Consul General or a representative to be appointed by him were named as attorney-in-fact to take such acts as should be necessary to preserve the private property interests in the Maret. Other individuals who also were beneficial owners of the Maret, but who were resident in Estonia, executed powers of attorney making Mr. Charles Recht, one of the proctors for Amtorg in the case at bar, their attorney-in-fact. Some of the latter powers were revoked by subsequent instruments executed before the United States Consul at Helsinki.[12] We think that it is sufficiently clear from the record that Mr. Kaiv represented and does now represent several individuals who, absent the requisition of the Maret by the United States Maritime Commission, hereinafter referred to, would have beneficial interests in the Maret and who presently have an interest in preserving the fund in the hands of the Treasurer of the United States.

On August 3, 1940, Sovfracht cabled Amtorg in New York naming about eighteen "Estonian Latvian" ships, described as being "chartered on time charter . . . at present in American and Canadian port waters",[13] and directed Amtorg to follow the movement of the ships, to get in touch with the captain of each and, if necessary, to arrange to have an agent supply bunkers and provisions

[12]See Libelant's Exhibits Nos. 11, 13.
[13]See Exhibit No. 25.

for them. Sovfracht also directed Amtorg to telegraph or cable information concerning the status of each steamship.

On the back of Exhibit 18, a cablegram dated August 2, 1940, from Amtorg to the Maret, appears a message written in pencil which was sent apparently by Saguenay to some undisclosed person, perhaps Winchester or West Indian Company, Ltd. (hereinafter referred to as "West Indian"), the latter apparently being an agent for the Maret at St. Thomas, requesting that instructions be given to the Maret to proceed to Norfolk, Virginia, in ballast in order that the ship might be delivered in accordance with the terms of her charter to Saguenay. This message ends with the sentence, "Captain replenish bunkers sufficient reach Norfolk with safe margin telegraph acknowledgement and sailing." On the seventh of August Amtorg cabled the Maret, "Tallinn transferred you 6,000 dollars take necessary bunkers and proceed to Murmansk direct."[14] It appears from the record that Captain Hall did not receive this money. On August 8, 1940, a cable signed "Amtorg Vassiliev" was sent to Sovfracht at Moscow quoting a cable sent by Hall to Amtorg, stating that he needed 750 tons of coal and provisions which would cost $11,000 to enable the Maret to proceed to Murmansk.[15] On August 12, 1940, Amtorg cable to Hall, "Sovfracht transferring $11,000 to Winchester wire when sailing Murmansk."[16] It appears that Sovfracht did not transfer this money to Winchester, but that funds were received later as indicated in the following paragraph. On August 19, 1940, Sovfracht cabled Amtorg, "Maret money being transmitted by Tallinn."[17]

On August 27, 1940, Amtorg transferred by cable to Hall as master of the Maret $3,000 for "crew's wages".[18]

[14]See Exhibit No. 27.
[15]See Exhibit No. 34.
[16]See Exhibit No. 41.
[17]See Exhibit No. 52.
[18]See Exhibit No. 70.

On September 9, 1940, Amtorg cabled to West Indian $11,-000 following further requests by Hall for funds.[19]

Claimant's Exhibit No. 9 is a bill of West Indian totaling $11,342.77, dated September 13, 1940. It includes a charge of $7,545.91 for 849 tons of coal, shipchandler's charges of $1,339,73, a charge of cash delivered to Captain Hall of $1,500, and other smaller charges for water, pilotage, medical attention, and similar items. Johannes Rasmussen, an accountant for West Indian, testified that no coal was put on board the Maret until West Indian had received the cabled draft from Amtorg referred to. He subsequently modified this statement by saying that 199 tons of coal were put on board the Maret on July 30, 1940, and 650 tons on September 12, 1940.[20] The evidence as to the date of payment by West Indian of the Maret's shipchandler's bill cannot be definitely settled from the present record,[21] nor is it clear when the other disbursements included in West Indian's bill were made by that company on behalf of the Maret.[22] It also appears that Mr. Charles

[19] See Exhibit No. 90.

[20] See appendix, p. 76.

[21] See appendix, pp. 76-77.

[22] Amtorg originally claimed there was due to it a total of $15,642.77. The claim was amended without formal pleading (see Appellant's appendix, p. 18) to eliminate $500. Mr. Patten, of counsel for Amtorg, stated: "We are amending our claim to eliminate $500, an amount which we now find was handled by the West Indian Company and not by Amtorg Trading Corporation. Our claim is therefore reduced by the amount of $500; the sum now being $15,142.77 plus interest thereon at the rate of 6% from September 11, 1940, plus costs. That is our statement of what we are claiming in this case."

The court found for Amtorg in the sum of $15,187.77, plus interest and costs. It is not clear how the court arrived at the amount of its judgment. The sum of $500 eliminated by Mr. Patten apparently was advanced on April 17, 1941, by West Indian Company. See paragraph "Twelfth" of the libel in rem appendix, p. 5. See receipt signed by Mr. Niin and the members of the Maret presently attached to "P's" Exhibit No. 1 (introduced in the case before the District Court at No. 69 - 1942), letter of West Indian Company to Messrs. Rounds, Dillingham and Nagle.

The sum of $500 advanced on May 23, 1941, was not excluded. It does not appear from the record who made this advance. Apparently no proof was offered in this respect.

Recht gave Mr. Julius Niin, the first officer of the Maret, the sum of $300[23] while on a trip to St. Thomas. This payment was made about March 26, 1941.

In the latter part of 1940[24] Captain Truberg filed[25] a possessory libel against the Maret in the District Court of the Virgin Islands at "Civil No. 29 - 1940." Amtorg intervened in this suit. Because of a joint petition by the parties to the court for a general continuance, this case was not decided and has now probably become moot by reason of the requisitioning of the Maret by the War Shipping Administration, referred to more specifically hereinafter. Some of the evidence taken in the proceeding and certain exhibits were introduced into the case at bar by stipulation of the parties.[26]

On September 16, 1941, the Maret, still at St. Thomas, was requisitioned by the War Shipping Administration acting for the United States Maritime Commission.[27] The requisition was effected in accordance with an Executive Order of the President of the United States, made pursuant to the Act of June 6, 1941, ch. 174, 55 Stat. 242. Section 1 of the Act, 50 U.S.C. Appendix § 1271, provides that upon the requisitioning of a foreign vessel by the Maritime Commission ". . . just compensation shall be determined and made to the owner . . . of any such vessel in accordance with the applicable provisions of section 902

[23]See Libelant's Exhibit No. 2.
[24]The exact date is not apparent from the record and we have neither pleadings nor docket-entries in the suit at No. 29 - 1940 before us.
[25]See notes 4 and 8, supra.
[26]We note in passing that Finding of Fact No. 8 made by the court below states, "That the intervention and claim of the Amtorg Trading Corporation in Civil No. 29 - 1940 and the libel and complaint in this cause have been incorporated together for a trial and decision of these two causes." We assume that this finding of fact was entered by inadvertence. We think the finding amounts to nothing more than a statement by the District Court that certain evidence and documents received in evidence in No. 29 - 1940 have been received as evidence in this case.
[27]Executive Order of Feb. 7, 1942, No. 9054 (see 7 F.R., No. 28,837, Feb. 10, 1942) established the War Shipping Administration and transferred to it certain functions and duties of the United States Maritime Commission.

of the Merchant Marine Act, 1936, as amended . . ." Section 1 requires also "That such compensation . . . shall be deposited with the Treasurer of the United States . . . and shall be subject to be applied to the payment of the amount of any valid claim by way of . . . maritime lien . . . upon such vessel . . . subsisting at the time of such requisition . . ."

 By Section 3(a) of the Act of March 24, 1943, ch. 26, 57 Stat. 45, 50 U.S.C. Appendix § 1271, the second proviso of Section 1 of the Act of June 6, 1941, was amended to read as follows: "Provided further, That such compensation hereunder, or advances on account thereof, shall be deposited with the Treasurer of the United States, and the fund so deposited shall be available for the payment of such compensation, and shall be subject to be applied to the payment of the amount of any valid claim by way of mortgage or maritime lien or attachment lien upon such vessel, or of any stipulation therefor in a court of the United States, or of any State, subsisting at the time of such requisition or taking of title or possession; the holder of any such claim may commence prior to June 30, 1943, or within six months after the first such deposit with the Treasurer and publication of notice thereof in the Federal Register, whichever date is later, and maintain in the United States district court from whose custody such vessel has been or may be taken or in whose territorial jurisdiction the vessel was lying at the time of requisition or taking of title or possession, a suit in admiralty according to the principles of libels in rem against the fund, which shall proceed and be heard and determined according to the principles of law and to the rules of practice obtaining in like cases between private parties, and any decree in said suit shall be paid out of the first and all subsequent deposits of compensation; and such suit

shall be commenced in like manner provided by section 2 of the Suits in Admiralty Act. . . ."[28]

[28]There is no issue raised in the case at bar as to the period of limitation set out in Section 3(a) of the Act of March 24, 1943. On July 2, 1942, notice of the deposit with the Treasurer of the United States by the War Shipping Administration vice the Maritime Commission was published in the Federal Register. See F.R. Doc. 42 - 6221. The suit at bar in the District Court of the Virgin Islands at its No. 69 - 1942, was filed November 17, 1942.

While Section 3(a) gives a right to the claimant to bring suit in "the United States district Court" from the custody of which the vessel was taken, we think that it was the intention of Congress to include such suits within the jurisdiction of the District Court of the Virgin Islands despite the fact that that court is not, speaking strictly, a "United States district court." For analogy see Balzac v. Porto Rico, 258 U.S. 298, 312, 42 S. Ct. 343, 66 L. Ed. 627; Ex parte Bakelite Corp., 279 U.S. 438, 49 S. Ct. 411, 73 L. Ed. 789; O'Donoghue v. United States, 289 U.S. 516, 535, 53 S. Ct. 740, 77 L. Ed. 1356. The District Court of the Virgin Islands has frequently been included in legislation pertaining to the United States Courts. See Act of Aug. 7, 1939, ch. 501, 53 Stat. 1223, 28 U.S.C. § 444 et seq. [now 28 U.S.C. § 601 et seq.], providing for the Administration of the United States Courts. This act treats the District Courts for the various territories and possessions in the same manner as the United States Courts in continental United States. The term United States District Court as used in Section 3(a) was undoubtedly employed in the sense of a United States court having admiralty jurisdiction. See also Sec. 28 of the Act of June 22, 1936, ch. 699, 49 Stat. 1814, 48 U.S.C. § 1406, specifying the jurisdiction of the District Court of the Virgin Islands [since superseded by 48 U.S.C. § 1612].

The Act of June 6, 1941, 55 Stat. 242, 50 U.S.C. Appendix § 1271, authorizes the President to requisition "any foreign merchant vessel which is lying idle in waters within the jurisdiction of the United States, including the Philippine Islands and the Canal Zone, . . . necessary to the national defense." We think that the inclusion of the Philippine Islands and the Canal Zone is not by way of limitation of the powers of the President but by way of their enlargement. Obviously, a vessel lying in a port in the Virgin Islands is in waters subject to the jurisdiction of the United States. The bill (H.R. 4466) as originally drafted did not contain the phrase "including the Philippine Islands and the Canal Zone." Senate Report No. 277 (77th Cong. 1st Sess.) explains the purpose of the amendment as follows: ". . . the amendment expressly includes as part of the United States for the purposes of the section, the Canal Zone and the Philippine Islands, which have a special character under existing statutes and may not otherwise be included in the jurisdiction of the United States for the purposes of the bill." The report contains a letter from Chairman E. S. Land to the Hon. S. O. Bland, Chairman, Committee on Merchant Marine and Fisheries. Admiral Land declares in urging the enactment of the bill that "some 70 vessels (Danish, Italian, and German) in ports of the United States and its possessions, including the Canal Zone and the Philippine Islands, have been taken into protective custody. It is suggested that the bill be amended so as to permit the use, under its provisions, of any immobilized tonnage that may be acquired by the United States by means other than voluntary transfer." It is evident that the legislature

431

The Commission deposited with the Treasurer of the United States "on account of just compensation for the . . . [S.S. Maret] . . . " the sum of $25,000. See note 28 supra. This deposit is now available to compensate the holders of valid maritime liens on the Maret existing at the time of the requisition.

Pursuant to the amendment effected by Section 3(a) of the Act of March 24, 1943, Amtorg brought its suit in the court below seeking payment to it of a portion of the fund deposited with the Treasurer of the United States. Mr. Kaiv filed an answer as Consul General of the Republic of Estonia, as trustee or custodian under the principle of Estonian law known as negotiorum gestor,[29] and as attorney-in-fact for some of the owners of beneficial private interests in the Maret. The court below gave judgment for Amtorg in the amount of $15,187.77. Mr. Kaiv has appealed.

The primary question presented for our determination is whether or not Amtorg has a valid maritime lien for the advances made by it to Captain Hall or made by it to West Indian. A preliminary question must be disposed of, however. It is asserted by the appellee that Mr. Kaiv, as consul general or otherwise, has no standing in the suit and hence no right to appeal. We think that this contention cannot be sustained.

The libel alleges and the answer admits that title to the Maret has passed by requisition to the United States Maritime Commission. Section 1 of the Act of June 6,

intended to include ships in the ports of territorial possessions such as the Virgin Islands. See the Virgin Islands Acquisition Act, 48 U.S.C. § 1391, 1394-1396. Since Congress intended vessels there lying idle to be acquired by the President for war purposes, Congress must have intended persons holding liens upon such vessels to be compensated as provided by the Act of March 24, 1943.

[29] This is a doctrine of the civil law. It embraces a principle of volunteer trusteeship of property entered into by some person in the absence or incapacity of the owner of the property in order to protect it. See 2 Bouv. Law Dict., Rawle's Third Revision, p. 2331.

1941, 55 Stat. 241, provided in material part that just compensation shall be determined and paid by the Commission as authorized by the section to the person entitled thereto. The amendment to the second proviso provides for the payment of valid maritime claims against the vessel.[30] Obviously the compensation to be paid by the United States to the owner of a requisitioned vessel may be reduced by the amount of valid maritime liens or claims which may be asserted against the vessel. It follows that the owners of the Maret are interested in seeing to it that the vessel and its value are not subjected to invalid maritime claims which might be paid since the amount of their compensation for the vessel would be reduced correspondingly.

Mr. Kaiv's right to appear as a party and his right to appeal are based on the three contentions which we have stated. Properly executed powers of attorney from persons having beneficial interests in the Maret, filed in this proceeding, are in themselves sufficient to warrant his standing as a party and an appellant. The Treaty between the United States and Estonia is still in full force and effect and Mr. Kaiv's standing as a general consular agent for his government cannot be impeached successfully.[31] It has long been the law that the consular agents of nations are to be accorded the right to appear in our courts to protect their nationals and

[30]The amendment was effected, as we have said, by Section 3(a) of the Act of March 24, 1943, 57 Stat. 45.

[31]A letter dated December 20, 1940, signed by Mr. Loy W. Henderson, Assistant Chief, Division of European Affairs, addressed to Mr. Beck, of counsel for Mr. Kaiv, states, inter alia, that the government of the United States "regards as still in force the Treaty of Friendship, Commerce, and Consular Rights between the United States and Estonia, signed on December 23, 1925." and states that "This government also continues to recognize Mr. Johannes Kaiv as Acting Consul General of Estonia in New York."

This letter, which accompanied a copy of the treaty referred to in note 10, supra, is marked "Libell #3 for identification not admitted." We will admit it for the purpose of this suit since the case at bar is before us de novo. The admission, however, is made subject to subsequent objection by the parties as to its authenticity or relevancy.

their nationals' property. The Bello Corrunes: The Spanish Consul, Claimant, 6 Wheat. 152, 5 L. Ed. 229. Mr. Kaiv's right to appear and to appeal is thus settled.

Section 30, subsection P of the Merchant Marine Act of June 5, 1920, c. 250, 41 Stat. 1005, 46 U. S. C. § 971, provides, "Any person furnishing . . . supplies . . . or . . . necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." Section 30, subsection R of the same Act, 46 U.S.C. § 973, provides in part that " . . . nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the . . . supplies, or other necessaries was without authority to bind the vessel therefor."

The Government of the United States has not recognized the absorption of the Republic of Estonia by the Union of Soviet Socialist Republics.[32] The Secretary of State of the United States has certified that " . . . the legality of the so-called 'nationalization' laws and decrees, or of any of the acts of the regime now functioning in Estonia, is not recognized by the Government of the United States."[33] From the record before us it is apparent that the Soviet Republic of Estonia or the Union of Soviet Socialist Republics is the real party in interest in the suit at bar. The Estonian State Steamship Company and Sov-

[32]See the Certificate of the Secretary of State, Libelant's Exhibit 117.
[33]See Libelant's Exhibit 118. The certificate of the Secretary of State is dated April 15, 1941. It refers to the Soviet Republic of Estonia. The City of Tallinn did not fall to the Germans until August 29, 1941. See Americana Annual, Americana Corporation, p. 264.

fracht are agencies of the Governments named. Amtorg is the general agent of Sovfracht for the Maret as is shown by the cablegrams passing between Sovfracht and Amtorg. Since the decrees purporting to nationalize the Maret have not been recognized by the Government of the United States, should it follow that the asserted ownership of the Maret by the Estonian State Steamship Company may not be recognized by the District Court of the Virgin Islands or by this court? Should the ownership of the Maret therefore be deemed to remain as it was prior to June 17, 1940, insofar as the record in this case discloses such ownership? Section 30, subsection P of the Act of June 5, 1920, as amended, the Merchant Marine Act, which we have quoted, provides that any person furnishing supplies or necessaries to a vessel upon the order of the owner of such vessel or of a person authorized by the owner, shall have a lien upon her. Since the decrees of nationalization made by the authorities and agencies of the Soviet Republic of Estonia and the Union of Soviet Socialist Republics have not been recognized by the Executive, should it be held that the supplies furnished to the Maret were not furnished upon the order of the owner?

■ A subsidiary question immediately suggests itself. Does Amtorg have the right in the light of the facts referred to in the preceding paragraph, to bring the suit at bar? We think that it has such a right.[34] Amtorg is a corporation of the State of New York and, without regard for its relation to its principal or principals, as a corporation

[34]In so deciding it is not necessary to deal with any question raised by the nonrecognition by the Executive of the decrees purporting to nationalize the Maret. See such cases as Russian S.F.S. Republic v. Cibrario, 235 N.Y. 255, 139 N.E. 259, and Republic of China v. Merchants' Fire Assur. Corp. of New York, 9 Cir., 30 F.2d 278, which have been criticized by learned writers. See Borchard, "The Unrecognized Government in the American Courts," 26 American Journal of International Law 261, but observe that certain of these cases were cited by Mr. Justice Stone in Guaranty Trust Co. v. United States, 304 U.S. 126, 137, 58 S. Ct. 785, 82 L. Ed. 1224, as definitive of the proposition that an unrecognized government could not maintain a suit in our courts.

of New York it must be held to be entitled to bring the suit at bar.[35]

▮ A far more difficult question is raised in respect to the ownership of the Maret by the Estonian State Steamship Company. Whatever may have been the precise ownership of the Maret prior to the absorption of Estonia (see note 1, supra), it is clear that the beneficial interest in the Maret was possessed by citizens of the Republic of Estonia or by an Estonian corporation. It also may not be controverted that on June 17, 1940, the Union of Soviet Socialist Republics occupied Estonia and thereafter created the Soviet Socialist Republic of Estonia. That the government thus created was a government exercising general jurisdiction throughout the whole of Estonia is a matter of common knowledge. That government, as we have stated, passed the decrees of nationalization purporting to transfer ownership and title of vessels owned by Estonian nationals and of Estonian registry to the Estonian State Steamship Company. The question presented by the facts of the case at bar, however, are different in essential respects from those which were before the courts in such cases as M. Salimoff & Co. v. Standard Oil Co.,[36] 262 N.Y. 220, 186 N.E. 679, 89 A.L.R. 345; Banco de Espana v. Federal Reserve Bank, 114 F.2d 438, 441 - 445,[37] and The Denny,[38]

[35]See the interesting commentary on the employment of this corporate entity in Briggs, "Non-Recognition in the Courts: The Ships of the Baltic Republic.", 37 American Journal of International Law, 585, 595-596.

[36]In the cited case, Salimoff sought to maintain an action in the Supreme Court of New York for oil expropriated by the Union of Soviet Socialist Republics. The Court of Appeals of New York stated, "The oil property confiscated was taken in Russia from Russian nationals. A recovery in conversion is dependent upon the laws of Russia. . . . When no right of action is created at the place of wrong, no recovery in tort can be had in any other state on account of the wrong."

[37]In this case the then Spanish Ambassador, recognized by the State Department, arranged for the transfer of silver to the Federal Reserve Bank at New York. Before any payments were made, the Spanish Government which had arranged for the transfer was overthrown. The Treasury Department of the United States none the less paid the amount due on the silver and completed the acquisition of possession. Judge Clark, speak-

127 F.2d 404, decided by this court. Though the authorities cited throw some light upon the controversy before us, they are not decisive and it is necessary therefore to embark upon a somewhat extended discussion of the point at issue under this phase of the case.

 It is conceded by all authorities that the acts of the Executive in the "political" field are binding upon our courts. This was reiterated by the Supreme Court of the United States in its recent decision in United States v. Pink, 315 U.S. 203, 62 S. Ct. 552, 86 L. Ed. 796. In the Pink case Mr. Justice Douglas said at page 229, of 315 U.S. at page 565 of 62 S. Ct., 86 L. Ed. 796, "The powers of the President in the conduct of foreign relations included the power, without consent of the Senate, to determine the public policy of the United States with respect to the Russian nationalization decrees." The Court of Appeals of New York had disregarded the "assignment" provisions of the Litvinov Agreement which the Supreme Court held were binding upon all courts within the United States. After citing the Guaranty Trust Co. case, Mr. Justice Douglas said that the authority of the Executive to determine a political matter such as the recognition of a foreign government ". . . is not limited to a determination of the

ing for the Circuit Court of Appeals for the Second Circuit (see 114 F.2d at pages 442, 443) stated that the courts will leave for the Executive the determination of all "political" issues; that this meant such matters in the international field "as the recognition of new governments or the making of treaties, not the direct determination of questions of property." He went on to say, "The governmental acts of a foreign country done within its own borders are not subject to examination in our courts." The Court held that since the governmental acts performed by the former Spanish Government were valid when done and since ". . . there has been . . . prompt acceptance of the money payments made by our government . . .", the assertion that the Federal Reserve Bank had engaged in a void or voidable transaction could not be countenanced.

[38]In The Denny, 127 F.2d 404, this court held that acknowledgments and authentications of powers-of-attorney made before a public officer (the equivalent of a notary) of the Soviet Republic of Lithuania were sufficient and were admissible as evidence of proof of agency. The corporations which had owned The Denny and her cargo had been nationalized by the Soviet Republic of Lithuania.

government to be recognized. It includes the power to determine the policy which is to govern the question of recognition." We think that the solution to our problem is suggested by the sentence last quoted. See also United States v. Belmont, 301 U.S. 324, 328, 57 S. Ct. 758, 81 L. Ed. 1134, and Oetjen v. Central Leather Co., 246 U.S. 297, 38 S. Ct. 309, 62 L. Ed. 726.

Obviously the recognition or nonrecognition of the Soviet Republic of Estonia is a political question for the determination of the Executive. But is the question of recognition or nonrecognition of the decrees of an unrecognized government which actually governs likewise a political matter for the sole determination of the Executive under the circumstances of the case at bar? To so conclude would mean that the nonrecognition of decrees by the Executive would be binding on the courts of this country adjudicating interests in property within the jurisdiction of the United States, interests now claimed by an agency of the unrecognized government but which belonged formerly to other persons, persons now subject to the decrees of the unrecognized government. This frames the issue before us.

Much has been written as to the proper determination of such issues and the views expressed by the decisions of the courts and by the writers of learned articles are not in harmony. In "The Unrecognized Government in the American Courts", it is urged that recognition or nonrecognition by the Executive should have little or no effect upon judicial determinations by the courts made in respect to rights in property claimed by a foreign sovereign or by foreign nationals. Mr. Borchard asserts, "The question is one of the plaintiff's existence as a government, not its diplomatic recognition. Whether the plaintiff is a government is susceptible of proof quite independent of executive pronouncement. The right to sue is more than a mere matter of diplomatic comity; it is an elementary conse-

quence of the right to possess property."[39] See also Connick, "The Effect of Soviet Decrees in American Courts", 34 Yale Law Journal 499, 505 et seq., and Fraenkel, "The Juristic Status of Foreign States, Their Property and Their Acts". 25 Columbia Law Review 544. Compare, however, the early decision of the Supreme Court in United States v. Rice, 4 Wheat. 246, 4 L. Ed. 562. Mr. Borchard suggests that there is a logical approach to the problem on the ground as to whether or not the foreign law invoked is or is not in conflict with the public policy of the forum. Such an approach was attempted by Judge Cardozo in Fred S. James & Co. v. Second Russian Ins. Co., 239 N.Y. 248, 146 N. E. 369, 37 A.L.R. 720. Judge Cardozo elucidated a similar approach in Sokoloff v. National City Bank of New York, 239 N.Y. 158, 145 N.E. 917, 37 A.L.R. 712. Cf. Judge Crane's opinion in Sokoloff v. National City Bank of New York, 250 N.Y. 69, 164 N.E. 745. See also Wulfsohn v. Russian, etc., Republic, 234 N.Y. 372, 138 N.E. 24, which cites decisions of the English courts as authority for the proposition that except where the existence of a government becomes a political question affecting neutrality laws, the recognition of the decrees of prize courts or similar questions, the fact of the existence of such a government may be proved in other ways than by the determination of the Executive. Cf. Banque de France v. Equitable Trust Co., D.C., 33 F.2d 202, 206. In the cited case Judge Goddard, after referring to the views expressed by Judge Cardozo in the Sokoloff case, said, "Justice requires that effect should be given by our courts, even though we do not recognize the Russian Government, to those acts in Russia upon which the rights of our citizens depend, provided that in so doing our judicial department does not encroach upon or interfere with the political branch

[39]See "The Unrecognized Government in the American Courts," at p. 266, cited in note 34 supra.

of our government."[40] citing Hervey, "Legal Effects of Recognition in International Law", Chapter 7. It will be noted that Judge Goddard laid emphasis on the fact that "American" nationals were involved and that to prohibit them from asserting title to the gold, or to the chose-in-action which represented it, would in all probability have subjected them to double liability. This was in substance the ratio decidendi of Russian Reinsurance Co. v. Stoddard, 240 N.Y. 149, 147 N.E. 703. But in the case last cited, Judge Lehman stated at page 158 of 240 N. Y., 147 N.E. at page 705, ". . . until the State Department has recognized the new establishment [government], the court may not pass upon its legitimacy or ascribe to its decrees all the effect which inheres in the laws or orders of a sovereign." Judge Lehman went on to say, however, "It [the Executive branch] cannot determine how far the private rights and obligations of individuals are affected by acts of a body not sovereign, or with which our government will have no dealings. That question does not concern our foreign relations. It is not a political question, but a judicial question. The courts in considering that question assume as a premise that until recognition these acts are not in full sense law. Their conclusion must depend upon whether these have nevertheless had such an actual effect that they may not be disregarded. In such case we deal with result rather than cause. We do not pass upon what such an unrecognized governmental authority may do, or upon the right or wrong of what it has done; we consider the effect upon others of that which has been done, primarily from the point of view of fact rather than of theory."

[40]In this case the Equitable Trust Co. had received gold which the Banque de France had entrusted for safe keeping to the State Bank of the Russian Empire at Petrograd. The State Bank of the Union of Soviet Russian Republics had taken over the Bank of the Empire and had sent the gold to New York where it was claimed by the Bank of France.

■■■■■■ It will be observed from the words quoted that the Court of Appeals of New York has considered recognition by our Executive as an affirmative declaration of policy which forecloses our courts from questioning the legal effects of decrees made by the recognized government. On the other hand the New York Court has treated non-recognition of a foreign sovereign by our Executive as having a purely negative effect, one which leaves our courts free to determine the result of what has been done by the unrecognized sovereign. While the facts upon which the Court of Appeals rendered its decision in Russian Reinsurance Co. v. Stoddard may be distinguished from those of the case at bar since neither a foreign sovereign nor the agent of a foreign sovereign claimed the funds and securities in the Russian Reinsurance Co. case, the fact remains that that Court regarded nonrecognition by the Executive as freeing it from a regard for the executive action. This we think is contrary to the doctrine enunciated by Mr. Justice Douglas in the Pink case which we have quoted. We conclude that no valid distinction can be drawn between the political or diplomatic act of nonrecognition of a sovereign and nonrecognition of the decrees or acts of that sovereign. As Mr. Justice Douglas said in the Pink case, the political matter of the recognition of a foreign government is not limited to a determination of the government to be recognized, but "It includes the power to determine the policy which is to govern the question of recognition." We think that these words are as apt to a policy of nonrecognition of a foreign sovereign when demonstrated by our Executive as they are to a policy of recognition by our Executive.[41] Nonrecognition of a foreign sovereign and nonrecognition of its decrees are to be deemed to be as essential a part of the power confided by the Con-

[41]Compare the circumstances of the Pink case.

stitution to the Executive for the conduct of foreign affairs as recognition.

When the fact of nonrecognition of a foreign sovereign and nonrecognition of its decrees by our Executive is demonstrated as in the case at bar, the courts of this country may not examine the the effect of decrees of the unrecognized foreign sovereign and determine rights in property, subject to the jurisdiction of the examining court, upon the basis of those decrees.[42] A policy of nonrecognition when demonstrated by the Executive must be deemed to be as affirmative and positive in effect as a policy of recognition.[43]

We think that what we have just said is the underlying principle which governs the decisions of such cases as Silberberg v. The Kotkas, D.C., 35 F. Supp. 983; The Regent, D.C., 35 F. Supp. 985; The Kuressaar, 1941 A.M.C. 1190, 1192 - 1193; The Signe, D.C., 39 F. Supp. 810, affirmed sub nom. The Florida, 5 Cir., 133 F.2d 719, certiorari denied 319 U.S. 774, 63 S. Ct. 1439, 87 L. Ed. 1721, sub nom. Tiedemann at al. v. Estoduras S. S. Co., Inc.[44] But in the case at bar, we have pointed out, an unrecognized sovereign itself, the Soviet Republic of Estonia, is the actual party in interest. A fortiori it may not be heard to assert a claim based upon ownership of the Maret. To permit it to do so would nullify the effect of nonrecognition by our Executive. We think that the Supreme Court

[42]See and compare Kelsen, "Recognition in International Law. Theoretical Observations," 35 American Journal of International Law, 605, and the comment thereon by Mr. Brown and Mr. Borchard in 36 American Journal of International Law, at pp. 106 and 108 respectively.

[43]Indeed the Executive has made its position doubly plain, not only negatively by nonrecognition, but by affirmative orders "freezing" the property of citizens of the Baltic Republics, including the former Republic of Estonia, to prevent their transfer to the detriment of their nationals. See Executive Order No. 8389 of April 10, 1940, amending Executive Order No. 6560 of January 15, 1934, as supplemented by Executive Order No. 8484 of July 15, 1940, 12 U.S.C. § 95 note.

[44]See the cases cited and discussed in Briggs, "Non-recognition in the Courts, etc.", supra.

in the Pink case in effect states this principle. Cf. the decision of the House of Lords in The Arantzazu Mendi, App. Cas. 256 [1939]. Compare also the cases of Russian Government v. Lehigh Valley R. Co., D.C., 293 Fed. 133; Id., D.C., 293 Fed. 135.

■■ We conclude, therefore, in view of the position taken by the Executive, that neither the District Court of the Virgin Islands nor this tribunal can recognize the Estonian State Steamship Company as the owner of the Maret.[45] Since the decrees of nationalization and transfer made by the Soviet Republic of Estonia may not be recognized, we cannot hold that the supplies furnished to the Maret were furnished upon the order of her owner.

■■ While it is the law that the captain of a vessel is deemed to be generally authorized by the owner to procure supplies necessary for her operation or preservation and Captain Hall was in charge of the Maret when the supplies furnished by West Indian were put aboard her, the effect of such implied authorization is destroyed by the language of Section 30, subsection R of the Merchant Marine Act of June 5, 1920, c. 250, 41 Stat. 988, 1005, 46 U.S.C. § 973, which specifically provides that no lien shall be conferred ". . . when the furnisher knew, . . . for any other reason, the person ordering the . . . supplies, or other necessaries was without authority to bind the vessel therefor." Amtorg knew that the charter party made by the charterers with Saguenay required the vessel to be delivered to a safe port north of Hatteras. Amtorg expressly ordered Hall to disregard this clause of the charter

[45]There is an apparent inconsistency in holding that Amtorg, an agent of an unrecognized principal, may bring the suit at bar, while not recognizing the right of the principal to recover. This apparent inconsistency will disappear, we believe, on careful consideration of the facts and the law. Without embarking on a prolonged discussion of this subject, we think that it is enough to say that an agent frequently may have the capacity to bring a suit which on the facts must be decided against him and his principal. See the comment in Mr. Briggs' article cited in note 43 supra.

party with Saguenay. Amtorg knew, or with reasonable diligence could have ascertained and was in fact chargeable with the knowledge that the decrees of nationalization and transfer of the Maret were not recognized by the Government of the United States and that therefore the Estonian State Steamship Company or the Soviet Republic of Estonia were not the owners of the Maret and were without authority to bind a maritime lien upon her. It follows, therefore, that Amtorg cannot be subrogated generally to West Indian's furnisher's lien assuming that West Indian itself had such a lien.

 But quite aside from the foregoing, it is clear that Amtorg was purporting to act as the general agent for the Maret under the direction of Sovfracht. The Maritime Lien Acts did not change the general maritime law. Marshall & Co. v. The President Arthur, 279 U.S. 564, 567, 49 S. Ct. 420, 73 L. Ed. 846. It has been repeatedly held that a general agent cannot obtain a maritime lien. The West Irmo, 3 Cir., 1 F.2d 87; The Eurana, 3 Cir., 1 F.2d 684. See particularly The M. Vivian Pierce, D.C., 48 F.2d 644. Nor is a general agent entitled to subrogation to the lien of the supplier of necessaries under the circumstances presented by the case at bar. See Galatis v. Galatis, 5 Cir., 55 F.2d 571, 574. Compare The Cimbria, D.C., 214 Fed. 128, 129. Since Amtorg is shown by the record to have acted as a general agent it can have no lien by way of subrogation for the sums advanced by it to Captain Hall and to West Indian except perhaps to the very limited extent dealt with hereafter in this opinion. On the other hand, if Amtorg had no authority to deal with the Maret because its principals were not the vessel's owners, the decrees and proclamations of the Soviet Socialist Republic of Estonia being incapable of recognition by the courts of this country, Amtorg, as we have pointed out, can have

no lien under subsection P of section 1 of the Merchant Marine Act.

██-██ But aside from the foregoing, most of Amtorg's claim to a maritime lien is void for other cogent reasons. The greater part of the coal put on board the Maret was delivered after West Indian had received the cabled draft for $11,000 from Amtorg. 199 tons were put upon the Maret on July 30, 1940. 650 tons were put on board on the night of September 11-12, 1940.[46] According to the bill of West Indian to the Maret (Claimant's Exhibit No. 9), 849 tons in all were furnished to the Maret at a price of $7,545.91. The cost was 44 shillings a ton. It is obvious that 65 tons of coal of a value of about $5,775 were paid for in advance by Amtorg and West Indian could have had no lien for this sum and therefore no lien existed to which Amtorg conceivably could have been subrogated.[47] It also appears that at least $900 of the shipchandler's bill of $1,339.73 was paid by West Indian on the 14th of September and we think that the evidence warrants a finding that the shipchandler's supplies were delivered about September 10th or 11th, also after Amtorg's advance to West Indian had been received by the latter.[48] West Indian therefore could not have had a lien upon the Maret for at least $900 of the shipchandler's bill. It also appears from claimant's exhibit No. 9 that the sum of $1,500 was advanced to

[46]See appendix p. 76
[47]In making this statement we are not unmindful of the provisions of subsection P of Section 30 of the Act of June 5, 1920, the Merchant Marine Act, 46 U.S.C. § 971, that any person furnishing supplies or other necessaries to a vessel shall have a lien "and it shall not be necessary to allege or prove that credit was given to the vessel." This provision was contained in Section 1 of the Act of June 23, 1910, 36 Stat. 604, 46 U.S.C. § 971 note, and was discussed at length by this court in The Yankee, 3 Cir., 233 Fed. 919, 922-925. The language of subsection P permits the libelant in the words of Judge Woolley in The Yankee, supra, 233 Fed. at page 925 ". . . dispense with proof that credit was given the vessel . . .," but the language of the subparagraph will not serve to create a lien where supplies are paid for in advance. In such a case there is no debt or charge to be secured by lien or otherwise.
[48]See appendix pp. 76-77.

Captain Hall apparently for the payment of his wages. It is so well settled as not to require citation of authority that a captain of a vessel cannot have a lien upon her for his salary. There is also an "agency fee" of $150 for which Amtorg could scarcely claim reimbursement.

■ The total of claimant's exhibit No. 9, West Indian's bill for advances to the Maret, is $11,342.77. If we deduct all of the items referred to from this total there is left the sum of approximately $3,000. Included in this amount are items which cannot be allocated as to time or in relation to the proposed voyage to Murmansk or to the necessity of preserving the Maret or outfitting her for a voyage to a safe port north of Hatteras or for further operations under the Saguenay charter. These items include charges for pilotage, medical attention, running lines, motor launch and motor car service, cable charges, commission on disbursements, and a charge shown as "Expenses: Sailor E. Sepman." Some of these items (pilotage is an example) might have been authorized by Captain Hall in his capacity as captain of the Maret prior to any dispute as to the ownership of the vessel or as to where she should voyage. See subsection Q of section 30 of the Merchant Marine Act, 46 U.S.C. § 972. Such authorization would be valid without regard to the subsequent purported nationalization of the Maret or the events that transpired thereafter. In short, West Indian may have had a valid lien on the Maret for some of these advances properly incurred for the preservation and maintenance of the ship. See The Anna R. Heidritter, D.C., 289 Fed. 112, 114, and The Ascutney (Spice v. United States), D.C., 278 Fed. 991. If there are such items and Amtorg paid them by its advances to West Indian, Amtorg may be entitled to subrogation to the extent of its reimbursement of West Indian. Amtorg would be entitled to a lien to such a limited extent as would any other person who advanced money to pay the claim of one who

had supplied necessaries to a ship. Such advances would not be made by Amtorg as the general agent of the Maret under the direction of Sovfracht. Amtorg could not be considered to be a mere volunteer in making the advances for in fact it would have reimbursed the ship's agent, West Indian, which had paid for supplies or itself had supplied necessaries to the Maret at the request of her captain acting for the benefit of the ship and her beneficial owners, the Estonian citizens hereinbefore referred to or as required to effect a valid and subsisting charter party, the Saguenay charter.

The record, however, is chaotic and insufficient evidence has been proffered to enable us to decide the questions referred to in the previous paragraph. The findings of fact made by the lower court are incomplete and no opinion was filed by it. We think that on the present record we can go no further to resolve the contentions of the parties. Without additional evidence we cannot determine the liability of the fund in the hands of the Treasurer of the United States in respect to the items referred to in the last preceding paragraph. Consequently, we deem it necessary to appoint a commissioner upon an open commission to take further evidence as to these issues. Our order will provide that on application to the commissioner, and in his discretion, leave may be granted to the parties to make new allegations, pray for different relief, or interpose new defenses in respect to the issues which remain undecided.[49]

Requests for findings of fact and conclusions of law to be based upon the opinion of this court shall be filed by the respective parties at such time or times as we shall direct.

Pending the report of the commissioner and the submission of requests for findings of fact and conclusions of law

[49]See our Rule 25.

by the parties no final order will be entered by this court unless for cause hereafter shown.

GOODRICH, *Circuit Judge* (concurring).

This Court is not alone in finding difficulty in picking its way through the hard problems of political and legal consequences of recognition or nonrecognition, as the authorities cited above show. When our government recognizes the government of a foreign country that recognition can be in such terms and conditions as are mutually agreed upon. These terms and conditions are binding because, representing action by the federal government in its constitutional field, they are the supreme law of the land. I find difficulty in seeing a parallel in the case of nonrecognition which seems to me simply absence of recognition. But in the absence of recognition of the foreign government, it seems not improper, in a litigated matter, to deny effect to an act of that government which purports to change the ownership of a chattel many hundreds of miles away from its borders. Therefore, I think the result reached is the correct one.